James E. Cecchi
John M. Agnello
Donald A. Ecklund
Kevin G. Cooper
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Ave., Suite 2000
Seattle, WA 98101
(206) 623-7292

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Sq 5th Floor,
Boston, MA 02109
(617) 482-3700

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE INSULIN PRICING LITIGATION | |

### LOCAL 464A UFCW WELFARE SERVICES AND BENEFITS FUND
### CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................. 5

II.    PARTIES ............................................................................................................... 13

    A.     Plaintiff ..................................................................................................... 11

    B.     Defendants ................................................................................................ 13

III.   JURISDICTION AND VENUE .......................................................................... 14

IV.    DRUG PRICING IN THE UNITED STATES .................................................. 15

    A.     Entities Involved in Drug Pricing ......................................................... 15

    B.     The Drug Payment & Distribution Structure ...................................... 17

    C.     Health plans reimburse insulin purchases based on AWP................. 19

    D.     Health plans pay more when AWP rises. .............................................. 20

    E.     Drug Manufacturer Manipulation of PBM Incentives ...................... 21

V.     ANALOG INSULIN ............................................................................................. 24

    A.     Diabetes: The Disease and Demographics ........................................... 24

    B.     The Origins of Insulin Treatment ......................................................... 26

    C.     Current Insulin Treatment Landscape ................................................. 32

    D.     Climbing Insulin List Prices .................................................................. 34

    E.     Eli Lilly, Novo Nordisk, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status. ......................................................................................................... 48

    F.     The defendant drug manufacturers' list price inflation is unfair, inefficient, and harms Local 464A and class members............................ 57

VI.    TOLLING OF THE STATUTE OF LIMITATIONS........................................ 59

    A.     Continuing Violations Doctrine ............................................................ 59

    B.     Fraudulent Concealment Tolling .......................................................... 59

C.      Estoppel ................................................................................. 59

VII.    CLASS ACTION ALLEGATIONS ............................................. 59

VIII.   CLAIMS FOR RELIEF .............................................................. 66

COUNT ONE VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
        N.J. STAT. ANN. § 56:8-1, *ET SEQ.* .................................. 87

COUNT TWO VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
        ARIZ. REV. STAT. § 44-1521, *ET SEQ.* ............................... 91

COUNT THREE VIOLATION OF THE ARKANSAS DECEPTIVE TRADE
        PRACTICES ACT ARK. CODE § 4-88-101, *ET SEQ.* ........... 92

COUNT FOUR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
        LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* ........... 94

COUNT FIVE VIOLATION OF THE COLORADO CONSUMER
        PROTECTION ACT COLO. REV. STAT. § 6-1-101, *ET SEQ.* ........ 96

COUNT SIX VIOLATION OF THE CONNECTICUT UNFAIR TRADE
        PRACTICES ACT CONN. GEN. STAT. § 42-110A, *ET SEQ.* ......... 98

COUNT SEVEN VIOLATION OF THE DELAWARE CONSUMER FRAUD
        ACT DEL. CODE TIT. 6, § 2513, *ET SEQ.* ........................... 99

COUNT EIGHT VIOLATION OF THE D.C. CONSUMER PROTECTION
        PROCEDURES ACT D.C. CODE § 28-3901, *ET SEQ.* ............ 100

COUNT NINE VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE
        TRADE PRACTICES ACT FLA. STAT. § 501.201, *ET SEQ.* ......... 102

COUNT TEN VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE
        TRADE PRACTICES ACT GA. CODE ANN. § 10-1-370, *ET SEQ.* ...... 103

COUNT ELEVEN VIOLATION OF THE HAWAII ACT § 480-2(A)  HAW. REV.
        STAT. § 480, *ET SEQ.* .......................................................... 104

COUNT TWELVE VIOLATION OF THE IDAHO CONSUMER PROTECTION
        ACT IDAHO CODE § 48-601, *ET SEQ.* ............................... 105

COUNT THIRTEEN VIOLATION OF THE ILLINOIS CONSUMER FRAUD
        AND DECEPTIVE BUSINESS PRACTICES ACT 815 ILL. COMP. STAT.
        § 505/1, *ET SEQ.* ................................................................. 107

COUNT FOURTEEN VIOLATION OF THE KANSAS CONSUMER
    PROTECTION ACT KAN. STAT. § 50-623, *ET SEQ.* ....................................................108

COUNT FIFTEEN VIOLATION OF THE LOUISIANA UNFAIR TRADE
    PRACTICES AND CONSUMER PROTECTION LAW LA. REV. STAT.
    § 51:1401, *ET SEQ.* ........................................................................................................110

COUNT SIXTEEN VIOLATION OF THE MARYLAND CONSUMER
    PROTECTION ACT MD. COM. LAW CODE § 13-101, *ET SEQ.* ..............................111

COUNT SEVENTEEN VIOLATION OF THE MICHIGAN CONSUMER
    PROTECTION ACT MICH. COMP. LAWS § 445.902, *ET SEQ.* ................................112

COUNT EIGHTEEN VIOLATION OF THE MINNESOTA PREVENTION OF
    CONSUMER FRAUD ACT MINN. STAT. § 325F.68, *ET SEQ.* ...................................113

COUNT NINETEEN VIOLATION OF THE MINNESOTA DECEPTIVE TRADE
    PRACTICES ACT MINN. STAT. §§ 325D.43-48, *ET SEQ.* ...........................................114

COUNT TWENTY VIOLATION OF THE MISSOURI MERCHANDISING
    PRACTICES ACT MO. REV. STAT. § 407.010, *ET SEQ.* ..............................................115

COUNT TWENTY-ONE VIOLATION OF THE NEBRASKA CONSUMER
    PROTECTION ACT NEB. REV. STAT. § 59-1601, *ET SEQ.* ..........................................116

COUNT TWENTY-TWO VIOLATION OF THE NEVADA DECEPTIVE TRADE
    PRACTICES ACT NEV. REV. STAT. § 598.0903, *ET SEQ.* ...........................................117

COUNT TWENTY-THREE VIOLATION OF THE NEW HAMPSHIRE
    CONSUMER PROTECTION ACT N.H. REV. STAT. § 358-A:1, *ET SEQ.* ................118

COUNT TWENTY-FOUR VIOLATION OF THE NEW JERSEY CONSUMER
    FRAUD ACT N.J. STAT. ANN.S § 56:8-1, *ET SEQ.* .....................................................119

COUNT TWENTY-FIVE VIOLATION OF THE NEW MEXICO UNFAIR
    TRADE PRACTICES ACT N.M. STAT. § 57-12-1, *ET SEQ.* ...........................................121

COUNT TWENTY-SIX VIOLATION OF THE NEW YORK GENERAL
    BUSINESS LAW N.Y. GEN. BUS. LAW §§ 349-350 ........................................................122

COUNT TWENTY-SEVEN VIOLATION OF THE NORTH CAROLINA
    UNFAIR AND DECEPTIVE TRADE PRACTICES ACT N.C. GEN. STAT.
    § 75-1.1, *ET SEQ.* .............................................................................................................124

COUNT TWENTY-EIGHT VIOLATION OF THE NORTH DAKOTA
    CONSUMER FRAUD ACT N.D. CENT. CODE § 51-15-02 ..........................................125

COUNT TWENTY-NINE VIOLATION OF THE OHIO CONSUMER SALES
PRACTICES ACT OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*................................126

COUNT THIRTY VIOLATION OF THE OKLAHOMA CONSUMER
PROTECTION ACT OKLA. STAT. TIT. 15, § 751, *ET SEQ.* .........................................128

COUNT THIRTY-ONE VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT OR. REV. STAT. § 646.605, *ET SEQ.*................................................130

COUNT THIRTY-TWO VIOLATION OF THE SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT S.C. CODE ANN. § 39-5-10, *ET SEQ.*................................131

COUNT THIRTY-THREE VIOLATION OF THE TENNESSEE CONSUMER
PROTECTION ACT TENN. CODE ANN. § 47-18-101, *ET SEQ.*................................133

COUNT THIRTY-FOUR VIOLATION OF THE UTAH CONSUMER SALE
PRACTICES ACT UTAH CODE § 13-11-1, *ET SEQ.*.....................................................134

COUNT THIRTY-FIVE VIOLATION OF THE VERMONT CONSUMER
FRAUD ACT VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.* .................................................135

COUNT THIRTY-SIX VIOLATION OF THE VIRGINIA CONSUMER
PROTECTION ACT VA. CODE ANN. § 59.1-196, *ET SEQ.* .........................................136

COUNT THIRTY-SEVEN VIOLATION OF THE WISCONSIN DECEPTIVE
TRADE PRACTICES ACT WIS. STAT. § 100.18......................................................137

DEMAND FOR JUDGMENT.................................................................................138

JURY DEMAND.....................................................................................................138

The plaintiff, Local 464A UFCW Welfare Services and Benefits Fund (Local 464A or the plaintiff), on behalf of itself and all others similarly situated, for its complaint against defendants Eli Lilly and Company (Eli Lilly), Novo Nordisk Inc. (Novo Nordisk), and Sanofi-Aventis U.S. LLC (Sanofi) (collectively, the defendant drug manufacturers or defendants), allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.    INTRODUCTION

1.    Local 464A, a health benefit provider, brings this proposed class action against three drug manufacturers—Eli Lilly, Novo Nordisk, and Sanofi—for the artificial, deceptive, and unfair manipulation of their respective insulin products' list prices in the United States. The insulin medications at issue in this complaint are Humalog, Basaglar, Fiasp, Novolog, Levemir, Tresiba, Apidra, Lantus, and Toujeo.

2.    The insulin market should be extremely competitive. The analog insulins at issue have existed for decades. They cost very little to produce. And the competing insulin products sold by the three drug manufacturers are largely interchangeable with each other. So patients generally do not need to take one specific brand of insulin over the other to treat their diabetes. And health plans largely do not need to cover all insulin products since they are interchangeable. Such market conditions should yield lower insulin costs for health plans and diabetics. But because of defendants' concerted efforts, that hasn't happened.

3.    Drugs sold in the pharmaceutical industry can have many prices throughout the supply chain. But the price set by the manufacturer—the *list price* (also known as the wholesale acquisition cost or "WAC")—provides the basis for all prices set in the distribution chain. Eli Lilly, Novo Nordisk, and Sanofi each employed a scheme to widen the spread between this publicly

available list price and another secret price, the *net price*—or the price after subtracting rebates and discounts offered to market-middlemen known as pharmacy benefit managers (PBMs).

4.      PBMs represent health plans and act as third-party intermediaries when dealing with the drug manufacturers. In this role, PBMs create and maintain a list of drugs—called a formulary—that outlines the prescription medications the health plan will cover. PBMs profit when they can negotiate lower prices for drugs on their respective clients' formularies through rebates, usually by retaining a percentage of the list price and rebates.

5.      When two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the analog insulins), a PBM may sometimes exclude, or place in a non-preferred position, one of the medications in favor of another. When a drug is excluded from formulary or placed in a non-preferred position, plan beneficiaries shoulder a greater percentage or all the disadvantaged product's cost. As a result, the large PBMs can push significant portions of the market toward or away from the defendants' products in the branded analog insulin therapeutic category.

6.      PBMs typically make money in two ways. First, they keep the difference between what they pay pharmacies for drugs (a percentage of the list price plus dispensing costs) and what insurers pay them (a higher percentage of the list price plus dispensing costs). Second, PBMs pocket a portion of the difference between a drug's list price and the net price they negotiate with its manufacturer—i.e., the "spread" between prices. PBMs thus benefit both from higher list prices and higher spreads between list and net price. The higher the list price and the larger the spread between a drug's list and net price, the larger the PBM's profits. Knowing this, the drug

manufacturers have created a pricing system that turns what would be normal economic competition on its head.

7.      Specifically, the drug manufacturers engage in "shadow pricing," a tactic where they tacitly agree to follow each other's list price increases in near unison. Then, with identical list prices, the drug manufacturers need only 'compete' through kickbacks to PBMs in the form of enormous rebates. In other words, instead of lowering their *net* prices while maintaining their *list* prices constant, the defendants all raised their *list* prices in lockstep while keeping their *net* prices constant, as depicted below.

**Figure 1: Defendant drug manufacturers increase long-acting insulin list prices in lock-step**



**Figure 2: Defendant drug manufacturers increase long-acting insulin list prices in lock-step**



8.    This perverse form of competition has yielded absurd results. As the insulin products get older, more alternatives emerge, and market conditions become more competitive, the defendants' insulins become *more* expensive, not less. And not just by some small amount. In recent years, to prop up their net price in the competitive landscape, the defendants have resorted to aggressive list price increases, in lockstep, to make room for more rebates. In a five-year period alone, Eli Lilly, Novo Nordisk, and Sanofi raised their list prices by over 150%. List prices that used to be $75 fifteen years ago are now between $300 and $700. And *nothing* about the

defendants' analog insulins has changed in that period; the $600 drug is the exact same one the defendants sold for $75 years ago.

9.      As a result, the insulin list prices have become meaningless and divorced from net price. They do not reflect marketplace value for the products or cutting-edge technology. Nor do they reflect some increasing need to recoup investment. Rather, to the extent they are not completely arbitrary, they simply reflect the lengths to which the drug manufacturers have gone to avoid market forces.

10.     But while this pricing scheme benefits defendants and PBMs, it harms health plans and patients. Health plans must reimburse pharmacies for their plan members' insulin purchases at a set rate *tethered to the list price* that the defendants hike in unison. So, by creating a system where all the competing products bear equally high list prices, the defendants have foisted the financial consequences of this perverse form of competition onto the very parties that should benefit from it.

11.     The defendants will point out that health plans often receive a portion of the rebates they provide to PBMs, arguably mitigating the financial harm stemming from the defendants higher list prices. But such a claim misunderstands the problem. The plaintiff, like the class members it represents, receives and received rebates on a lump sum basis across all the drugs it purchases from a given pharmaceutical company (it does not receive individual rebates on specific drugs). Consequently, the plaintiff and like class members have no way of ascertaining the true net prices of the analog insulins. This lack of transparency results in two harms.

12.     First, the lack of transparency obfuscates the difference between the defendants' list and net prices such that the health plans, including the plaintiff, cannot ascertain whether the prices they pay for the analog insulins are fair and competitive.

13.     Second, this opaque dual pricing system has misled the plans into believing they are receiving a better deal on the analog insulins than they are actually receiving. The defendant insulin manufacturers and the PBMs have told health plans, like the plaintiff here, that the latter is benefiting from a system of high list prices and rebates—that the health plans are obtaining lower prices for the analog insulins than they would absent the rebates. This narrative is wrong. If the defendants were required to publish a list price that approximated their true net prices, the defendants would have to start competing through significantly lower *net* prices, rather than significantly inflated *list* prices. Despite selling interchangeable products, defendants have managed to escape the usual consequence of competition: lower prices. Their list price manipulation has enabled them to keep their net prices the same for decades, despite stiff competition. Clear, transparent pricing would force the defendants to compete on, and therefore lower, net price, benefiting both the plaintiff here and consumers.

14.     All of the defendants have participated in this arms-race escalation of reported list prices and, consequently, spreads. What's more, they admit it.[1]

15.     Olivier Brandicourt, the former-CEO of Sanofi, acknowledged the growing gap between list price and net price in sworn testimony before the United States Senate Finance Committee:

> Since 2012, the net price of Sanofi insulins has declined 25 percent.
> Yet patient out of pocket costs have continued to rise. If you take

---

[1] U.S. SENATE FINANCE COMM., *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug* (Staff Rept. 2021), at 66 n.344.

> Lantus, for instance, our most prescribed insulin, the net price has
> fallen by 30 percent since 2012. Yet over the same period, average out-
> of-pocket costs have risen approximately 60 percent for patients with
> commercial insurance and Medicare. It is my belief that declining net
> prices should result in lower out-of-pocket costs for patients. But
> clearly this is not always the case.[2]

16.     This is not first time the drug manufacturers have had to defend deceptive pricing.

In a similar case from nearly 20 years ago, defendant drug manufacturers "repeatedly asserted that

they had no duty to disclose what was publicly known to everyone, that is, that the [drug's list

price] was a 'sticker price' and never intended to reflect the drug's true average wholesale price."[3]

But the district court saw through this argument: "There is a difference between a sticker price and

a sucker price. . . . The [plaintiffs] . . . have it exactly right: '[I]f everything [about the drug] was

known to everybody, why did [d]efendants emphasize secrecy?'"[4] As the court explained, the

"defendants trumpeted a lie by publishing the inflated [list prices], knowing (*and intending*) them to

be used as instruments of fraud."[5]

17.     In this case, the defendants knew that their list prices served as the basis for health

plan payments. And they still published inflated, meaningless, and deceptive list prices for their

analog insulins in a scheme that unfairly deprives health plans and patients the benefits of

competition. This constitutes an unfair and unconscionable practice.

18.     The defendants' actions harm the class Local 464A seeks to represent: health plans

who pay PBMs and pay and/or reimburse pharmacies and PBMs that maintain mail-order

---

[2] Drug Pricing in America: A Prescription for Change, Part II, Hearing before the Committee on Finance United States Senate (Feb. 26, 2019), at 16.

[3] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003)

[4] *Id.*

[5] *Id.* at 167.

pharmacies for insulin purchases based on the drugs' list prices. Local 464A, like the proposed class it represents, offers health benefits to insulin-dependent patients. One of the key benefits it provides to its members is coverage of their drug costs. When a participant goes into a pharmacy to purchase an insulin, her health plan pays for a sizable portion of that prescription. And health plans, like Local 464A here, pay for that prescription based on *list* price. This formula is set out in contracts between the health plan class member and the pharmacy or PBM. Thus, Local 464A members and the proposed class's members purchases, at the point of sale, are based on the defendants list prices. The price reductions the defendants offer PBMs *are not reflected* in the negotiated rates Local 464A is charged for their covered participants' purchases. Thus, the larger the list price, the larger the amount Local 464A is charged. Each of the defendants was aware of the impact their list price increases had on health insurer payments to pharmacies.

19.    The defendants publicly represent that the list prices of their analog insulins are just that, *list* prices—a fair representation of the product's value in the market and a reasonable basis for consumer and health plan payments. So, when they inflate their list prices to arbitrary levels solely to provide increased rebates in exchange for formulary access, they mislead the plaintiff and the class and unfairly force them to reimburse pharmacies for their analog insulins at grossly inflated rates.

20.    As a result of the defendants' conduct, Local 464A and class members overpaid for the relevant insulins when they paid for these medications based on the defendants' list prices. The amount they overpaid is the difference between their share of the list price inflated by the scheme, and the percentage of that share that reasonably tracked the drug's true net price.

21.    This action alleges that the defendants violated various state consumer protection laws by engaging in a deceptive and unfair list pricing scheme with respect to their analog insulins. As to health plans who purchase from PBM-owned mail-order pharmacies, this action alleges a violation of the Racketeer Influenced Corrupt Organization Act (RICO), as, in this instance, health plans purchased analog insulins directly from a RICO-enterprise headed by the defendants. This scheme directly and foreseeably caused and continues to cause health plans to overpay for the insulins their insured members need.

## II.    PARTIES

### A.    Plaintiff

22.    Plaintiff Local 464A UFCW Welfare Services and Benefits Fund is a New Jersey trust that maintains its principal place of business at 245 Paterson Avenue, Little Falls, NJ 07424. Local 464A provides medical, prescription drug, dental, vision and legal service benefits to eligible members and their eligible, enrolled dependents. During the Class Period, Local 464A paid for insulin and those payments were based on the artificially inflated list prices. The plaintiff will continue to purchase insulin in the future. As a result, plaintiff has been injured.

### B.    Defendants

23.    Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana. Eli Lilly's principal place of business is Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly manufactures Humalog and Basaglar, which are used for the treatment of diabetes. Lilly's revenues from Humalog were $2.06 billion in 2022 and $2.45 billion in 2021.

24.     Defendant Novo Nordisk Inc. is a Delaware corporation and has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536. Novo Nordisk manufactures Fiasp, Novolog, Levemir, and Tresiba, which are used for the treatment of diabetes. Novo Nordisk's net sales of all its insulin products totaled 38.76 billion DKK (or approximately $5.61 billion) in 2022 and 39.94 billion DKK (or approximately $5.78 billion) in 2021.

25.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi manufactures Apidra, Lantus, and Toujeo, which are used for the treatment of diabetes. Sanofi's net sales from Lantus were €2.25 billion (approximately $2.44 billion) in 2022 and €2.49 billion (approximately $2.7 billion) in 2021. Sanofi's SEC Form 20-F for the year 2022 notes that "Lantus is particularly important; it was one of Sanofi's leading products in 2022 . . . ."

### III.    JURISDICTION AND VENUE

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over Local 464A's state law claims pursuant to 28 U.S.C. § 1367.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because each defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to this complaint took place within this district.

28.     The Court has personal jurisdiction over each defendant. Each defendant has transacted business, maintained substantial contacts, and/or committed the alleged unfair pricing scheme throughout the United States, including in this District. Defendants' unfair and unlawful conduct has been directed at, and has had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## IV.    DRUG PRICING IN THE UNITED STATES

### A.    Entities Involved in Drug Pricing

29.     The prescription drug industry consists of a network of entities, including pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health-and-welfare plans), pharmacy benefit managers, and patient-consumers.

30.     *Pharmaceutical Companies*. Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs. This remains true even if these companies contract out the actual production of their drugs. Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers. Critically, pharmaceutical companies set the prices of their drugs and then those prices are used to calculate payments consumers and health plans pay for and/or make at the pharmacy at the point of sale. The defendants here are pharmaceutical companies.

31.     *Wholesalers*. After production, the defendant manufacturers send their drugs to FDA-registered drug wholesalers for further distribution. Wholesalers purchase inventory and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.

32.    *Retail Pharmacies.* Retail pharmacies purchase drugs from the wholesalers. They then sell these drugs to consumers. When a retail pharmacy (a pharmacy with a physical location) sells a drug to a consumer, it looks up whether or not that consumer holds health insurance and then charges the consumer a price depending on his or her insurance status. Consumers with insurance are usually only responsible for a paying a portion of the drug's cost, with the health plan picking up the remainder of the bill.

33.    *Health benefit providers.* Health benefit providers include institutional insurers, self-insured employers, and health-and-welfare plans. These plans submit payments on behalf of insured individuals to healthcare providers for services rendered to those individuals. Health insurers also cover a portion of their beneficiaries' drug costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" includes public and private entities, the latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits. Local 464A and the proposed class are self-insured health benefit providers who bear the risk and cost of their members' purchases.

34.    *Pharmacy Benefit Managers.* Pharmacy benefit managers (PBMs) effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers. In this role, PBMs perform a variety of services on behalf of their health insurer clients, including the negotiation of rebates with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services. Nonetheless, they generally are not a direct link in the physical supply chain for

pharmaceutical products because, in most instances, they do not take possession or control of prescription drugs.

35.    There is one exception to this general rule. PBMs sometimes run their own mail-order pharmacies where consumers can buy drugs directly from the PBMs and have those drug shipped to them. For example, many diabetes patients purchase analog insulin through PBMs' mail-order pharmacies. Where PBMs run their own mail-order pharmacies, they do take possession of the drugs available for purchase in their mail-order pharmacies. In this situation, consumers and health plans, including the plaintiff, buy directly from the PBM.

36.    The largest PBMs are CVS Health, Express Scripts, and OptumRx. Together, they cover roughly 80 to 85 percent of privately insured Americans. Each offer mail-order pharmacy services to be used by health plans and/or their participants to purchase analog insulins.

**B.    The Drug Payment & Distribution Structure**

37.    *Distribution*. For retail pharmacy channels, branded prescription drugs are distributed from manufacturer to wholesaler, wholesaler to retail pharmacy (or mail order), and retailer to patient.

38.    *Downstream charges*. The downstream charges are from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of reimbursement and dispensing fees) and consumers (in the form of coinsurance, copayment, deductible payment, and/or cash).

39.    *Upstream charges*. The upstream charges are from PBMs directly back to the manufacturer. These upstream charges are price discounts the defendant drug manufacturers offer PBMs in the form of "rebates." They typically occur well after the point-of-sale transactions.

40.     The figure below illustrates this payment structure. This figure labels certain payments "payment" and others "negotiated payment." The term "payment" refers to individual payments, made at the time of delivery; for example, when a patient walks into a pharmacy and picks up her prescription. At that moment, her health plan—the class here—also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies. In contrast, a "negotiated payment" is a payment made under a negotiated contract. For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time. The figure also indicates the flow of products and rebates.

**Figure 3: The U.S. Drug Payment Structure**[6]



41.     When an insured consumer buys a medication from a pharmacy (a retailer), payment to the pharmacy based on list price. Typically, they pay what's called the *average wholesale price* (or AWP) minus some fixed percentage; and AWP itself is WAC (the list price set by the

---

[6] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

manufacturers) plus some fixed percentage. Importantly, the insurer's payment is based on the *list* price the drug manufacturer set for that drug.

C.      **Health plans reimburse insulin purchases based on AWP.**

42.     A drug's list price is the starting point for drug payments in the pharmaceutical distribution system. For this reason, it is publicly available and listed in compendia by drug price aggregators like First Data Bank.

43.     The use of drug list prices to calculate and communicate reimbursement payments was supposed to create an efficient system through which drug costs could be shared among the various purchasers—plans, consumers, and wholesalers. The purpose of a centralized price was to maintain the system's flexibility, minimize uncertainty through predictable costs, maximize coverage in a cost-effective manner, and provide a mechanism for competition among payers.

44.     To this end, health plans' reimbursement formulas are tied to AWP. When a consumer goes to a retail pharmacy (or the website of a mail order pharmacy) and requests to buy a drug, the pharmacy's computer system pulls up AWP, which is the list price the *manufacturer* of that drug set and published plus an approximately 15-20% markup. The basis for that price is *not* determined by the pharmacy or the wholesaler that brought the drug to the pharmacy. Rather, the pharmacy's computer system taps into a database of prices that manufacturers created and published through third party publishers. The pharmacy's search for the drug's price is akin to a stockbroker's search for the price of a stock; the pharmacy, like the broker, does not and cannot change or influence the list price.

45.     When a consumer purchases a branded insulin, the consumer pays her portion of the cost (whether that be a co-pay, a co-insurance payment, or deductible payment) and her insurer or health plan pays the other portion. The pharmacy reimbursement is set by a formula negotiated

between the pharmacy and the health plan (or the health plan's PBM, on behalf of the health plan) and based on AWP / WAC.

46.    The price benchmarks (i.e., AWP or WAC) used in their formulas are commonly adjusted by a percentage that is contractually set. For example, health insurer reimbursement to a pharmacy for an insulin could be determined based on the lower of the drug's (i) AWP – $x\%$, (ii) WAC + $y\%$, and (iii) payment cap.

47.    Despite some modifications to reimbursement policies over time, the most commonly and continuously used set of reference prices in reimbursement payment calculations and negotiations for retail channel drug transactions remains AWP.

48.    From an administrative perspective, AWP provides—or at least used to provide—a logical starting point for the calculation and communication of reimbursement to various pharmacy providers for various drugs. And given the historical use of AWP by all industry participants, one cannot discount the significance of AWP's entrenchment in the complex and highly automated payment system that is used to process billions of payments. As such, it is continued to be widely used to estimate costs and revenues.

49.    The defendants' list prices also serve as the immovable reference point from which PBMs and drug manufacturers negotiate rebates. As previously explained, PBMs create formularies for their health insurer clients, and those formularies significantly influence patients' drug purchasing behavior. Drug companies offer PBMs rebates—discounts off list prices—to influence the PBMs' formulary decisions.

**D.    Health plans pay more when AWP rises.**

50.    The defendants' publicly reported list prices for their insulin, used for pharmacy reimbursement transactions, has climbed further and further away from the net prices negotiated

by PBMs. The net prices of analog insulins to PBMs are much lower: 35%, 40%, or even 50% lower than list prices. While health plans received some of the rebates PBMs negotiate, a portion of these rebates stays with the PBM or other middlemen.

E.    **Drug Manufacturer Manipulation of PBM Incentives**

51.    PBMs turn a profit in two primary ways relevant here: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, PBMs take a cut of the drug price discounts they negotiate with drug companies. The manufacturers' "rebate" arrangements are meant to create an incentive for PBMs to negotiate lower *real* drug prices. But the manufacturers know that this business model can be manipulated such that PBMs no longer have an incentive to control costs.

52.    PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, i.e., when a drug "goes generic." But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar efficacy and risk profiles. That is the case with the analog insulins. In such a scenario, the drug companies should compete for formulary access by lowering their list prices.

53.    But the defendants have gamed the system. As the defendants have realized, the spread between net and list price can be enlarged by *raising list prices* while holding *net prices constant* (or decreasing them slightly). In exchange for this spread enlargement, the PBMs agree with the manufacturer, either explicitly or implicitly, to favor, or at least not disfavor, the drug with the most elevated list price. The defendants know that when they increase the list prices of their insulins, the PBMs can earn substantially greater revenues so long as net prices remain constant.

54.     The perverse incentives for larger list prices (and consequent health plan

overpayments) was described in a recent report on the drug industry:

> At the whole-market level, we sense that the price protection rebate
> arbitrage game is driving manufacturers to higher list price increases
> than would otherwise occur, particularly on the eve of a general
> election. Price protection rebates between brand manufacturers and
> PBMs are common, as are fixed rebate agreements between PBMs and
> a significant portion of their plan sponsors. When brand
> manufacturers' [list price] increases exceed the price protection
> threshold, the manufacturers rebate the difference to PBMs, who
> pocket the difference when these price protection rebates grow faster
> than the PBMs' fixed rebate commitments to plan sponsors. Thus all
> else equal in a given category, the product with the more rapid list
> price increases is more profitable to the PBM. Manufacturers,
> realizing this, don't want their products disadvantaged, and
> accordingly are driven to keep their rates of list price inflation at least
> as high, and ideally just a bit higher, than peers'. Durable list price
> inflation is the natural result. Net price inflation is unaffected, but
> unit volumes suffer as higher list prices directly impact consumers
> who have not yet met their deductibles.[7]

55.     This is not the first time manipulation of the spread between list and net prices has

been the subject of large-scale litigation. In *New England Carpenters Health Benefits Fund v. First

DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the District Court for the District of Massachusetts

certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher,

engaged in a scheme to inflate the list prices of brand name drugs. McKesson asserted that a class

could not be certified because the PBMs had become aware of the phony increase in the spread,

and promptly acted to offset the spread by vigorously seeking rebates for its health insurer clients.

However, part of the evidence the district court relied upon in rejecting this argument was

evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of

consumers and health insurers:

---

[7] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

> Because these PBMs benefited from the increased [list price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [third party payers] of the inflated AWP, let alone fiercely compete to mitigate any damage. As proof, Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[8]

56.    Just so, the defendants here have used the phony list prices to their advantage. They use the spread between prices to provide kickbacks to PBMs in exchange for formulary status. Indeed, as the District Court for the District of Massachusetts explained, rebates are really "direct kickbacks," disguised as market-share discounts and rebates."[9] This "rebate" scheme enables the defendants to maintain preferred formulary positions without reducing their net prices.

57.    And the PBMs benefit from the larger spreads. The PBMs boast of the "increased rebates" they have achieved, when, in reality, the "discounts" they have obtained are simply reductions off artificially-inflated list prices. In other words, these "discounts" are not discounts at all.

58.    The losers in this scheme are analog insulin consumers and the health plans who pay higher prices for insulin used by their participants. Defendants were well aware of the impact of their list prices on Local 464A and the class.

---

[8] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

[9] *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

# V.    ANALOG INSULIN

## A.    Diabetes: The Disease and Demographics

59.    Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with diagnosed diabetes. Over 30 million people, 9.4% of the country, live with diabetes. A life-threatening disease, many of those living with diabetes rely on daily insulin treatments to survive. Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days. Diabetic ketoacidosis is responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[10]

60.    The number of Americans who live with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over 10 million. Just 14 years later, the head count tripled again. Now over 30 million people—9.4% of the country—live with the disease. And this trend does not appear to be slowing: 86 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes.

61.    Diabetes occurs when a person has too much glucose—sugar—in their blood stream. Normally, the human body breaks down ingested food into glucose, which in turn feeds cells and

---

[10] Abbas E. Kitabchi, et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 Diabetes Care 1335, 1335 (2009).

enables them to function. In this process, insulin functions as a key, opening the cells and permitting glucose to enter. A lack of insulin or responsiveness to insulin causes the process to break down. Glucose is unable to enter the cells, which leads to high blood sugar levels. Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

62.     There are two basic types of diabetes. Roughly 90-95% of Americans living with diabetes developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term. To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement what their bodies produce. About a quarter of type 2 patients rely on insulin treatment.

63.     Type 1 diabetes occurs when a patient completely ceases insulin production. This form of diabetes is usually diagnosed in children and young adults, but can occur at any age. Unlike type 2 patients, people with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die. Individuals living with type 1 must rely on insulin treatments from the point of diagnosis until death.

64.     If left untreated or under-treated, diabetes can become a debilitating and deadly disease. Indeed, it remains the seventh leading cause of death in the United States despite the availability of effective treatment. People with diabetes are almost twice as likely to have heart disease or a heart attack and one and one-half times more likely to have a stroke as those without

the disease. Chronic kidney disease and failure is also much more common among those with diabetes. Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections and even amputations. Finally, the disease is the leading cause of blindness.

65.     The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos and Pacific Islanders. For example, Native Americans are 420% more likely to die from diabetes-related causes of death than other Americans. With decreased access to nutritious food sources and fitness options, low-income individuals are at a greater risk of obesity and, correspondingly, diabetes. These same demographic groups also account for a disproportionate share of the uninsured.

**B.     The Origins of Insulin Treatment**

66.     Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who can follow a prescribed treatment plan consistently, the harmful symptoms and health complications associated with the disease are entirely avoidable. And what's more, unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

67.     In 1922, two men pioneered a technique for removing active insulin from an animal pancreas that could then be used to treat human patients with diabetes.

68.     A "widely celebrated tale of biomedical serendipity,"[11] this breakthrough is revered for two reasons. First, the duo that discovered how to extract insulin for patient treatment was an unlikely pair: a young orthopedic surgeon without laboratory training, Frederick Banting, and his medical-student assistant, Charles Best. Second, neither Banting nor Best applied for a patent on

---

[11] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

their game-changing innovation because they wanted to ensure their discovery remained open to the public, available to all. This decision offers a sad commentary on the state of the current pharmaceutical industry.

69.    Ironically, Banting and Best eventually ended up applying for a patent to guarantee access: Banting and Best realized that if they did not patent their drug, someone else would. To prevent others from obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 each. As they wrote to the University's president, the patent was a form of publication: "When the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[12]

70.    After selling their patent to the University of Toronto, university researchers attempted to manufacture insulin on campus. However, they quickly realized they lacked the facilities necessary to meet the demand. Therefore, to scale production, the University of Toronto teamed up with Eli Lilly, "an established pharmaceutical company with experience producing glandular extracts."[13] Under this arrangement, Eli Lilly was allowed to apply for U.S. patents on any improvements to the manufacturing process. In addition to their contract with Eli Lilly, the Toronto team licensed the rights to produce insulin to a few other companies, including Denmark's Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium.[14] Those initial

---

[12] M. Bliss, *The Discovery of Insulin* (2013).

[13] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[14] Nordisk and Novo merged in 1989 to form Novo Nordisk.

licenses laid the groundwork for Eli Lilly and Nordisk's future domination over the sale of insulin products.

71.     Although the Toronto team's early iteration of insulin was immediately perceived as "a lifesaving drug of vast clinical public health significance,"[15] subsequent research led to further improvements in the drug's efficacy. The original animal insulin isolated by the Toronto team was short acting—it only had an effect on patient blood sugar levels for three to six hours. In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin altered its absorption into the blood stream, prolonging its effect. This form of insulin became known as long-acting. A subsequent innovation in 1946—the addition of zinc to form the crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH)—made it possible to combine long-acting and rapid-acting insulin. This advance allowed many diabetes patients to take a single daily injection. Soon after, a method for prolonging the action of insulin without adding protamine was discovered. These developments offered new options for the dosing of insulin. But they also extended the reach of insulin patents into the 1970s.

72.     When the animal-based insulin patents finally began to expire, researchers took another step forward in the development of insulin technology. In the late 1970s, scientists began to produce human insulin through recombinant technology. By 1982, Eli Lilly brought the first recombinant human insulins—Humulin R (regular) and N (NPH)—to the U.S. marketplace. Around the same time, Novo and Nordisk developed methods for chemically converting bovine insulin into human insulin. In 1988, a year before merging, Novo and Nordisk obtained approval for their own recombinant insulin. This innovation allowed them to continue shared domination

---

[15] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172 (2015).

over insulin sales with Eli Lilly. It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin patents, promising to stretch into the 21st century.

73.     After the introduction of human insulin, an improved understanding of the human genetic code and recombinant technology put a third insulin development within reach. In the mid-1980s, scientists began to modify the molecular structure of insulin, attempting to improve its physiological effects. By 1996, Eli Lilly had obtained approval for Humalog (generic name, insulin lispro), the first rapid-acting, man-made insulin. This new type of insulin—known as an analog—allowed for faster absorption times. Never far behind, Novo Nordisk released its own rapid-acting analog, Novolog (generic name, insulin aspart), in 2000. Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra (generic name, insulin glulisine).

74.     The same technological advances that brought about rapid-acting analogs gave rise to long-acting analogs. In 2000, Sanofi released the first long-acting analog. This drug was branded as Lantus (generic name, insulin glargine). Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir (generic name, insulin detemir). The first patents on these long-acting analogs expired in June 2014, nearly a century after Banting and Best's first patent application in 1923.

75.     In February 2015, Sanofi launched a higher dosage of insulin glargine, branded as Toujeo (generic name, insulin glargine). In September 2015, Novo Nordisk released a fourth type of long-acting insulin called Tresiba (generic name, insulin degludec). In December 2016, Eli Lilly

released its own version of insulin glargine, branded as Basaglar (generic name, insulin glargine). Basaglar is a follow-on product to Lantus.[16]

76.    In September 2017, Novo Nordisk released a fourth rapid-acting insulin called Fiasp (generic name, insulin aspart). Fiasp is a slightly modified version of Novolog. Table 2 summarizes the current insulin treatment landscape.

| Table 1: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2023 (WAC) |
| Human | Rapid-acting | Humulin R | Insulin Regular | Eli Lilly | 1982 | $148.70 (vial[17]) |
| | | Novolin R | Insulin Regular | Novo Nordisk | 1991 | $137.70 (vial[18]) |
| | Intermediate | Humulin N | Insulin Suspension Isophane (NPH) | Eli Lilly | 1982 | $148.70 (vial[19]) |
| | | Novolin N | Insulin Suspension Isophane (NPH) | Novo Nordisk | 1991 | $137.70 (vial[20]) |
| Analogs | Rapid-Acting | Humalog | Lispro | Eli Lilly | 1996 | $530.40 (pen[21]) $510.45 (vial[22]) |

---

[16] It is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's (FDCA) Abbreviated New Drug Application pathway—the normal pathway to generic entry—for approval. Instead, Basaglar was approved through a different FDCA pathway as a follow-on medication.

[17] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[18] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[19] Humulin N 100unit/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[20] Novolin N 100units/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[21] Humalog KwikPen 100unit/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Lispro 100U/1mL, Solution for injection).

[22] Humalog 100unit/ml Cartridge Solution for Injection (box, 5 cartridges, 3 ml Insulin Lispro 100U/1mL, Solution for injection).

| Table 1: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2023 (WAC) |
| | | Novolog | Aspart | Novo Nordisk | 2000 | $558.83 (pen[23]) $289.36 (vial[24]) |
| | | Apidra | Glulisine | Sanofi | 2004 | $548.52 (pen[25]) $283.95 (vial[26]) |
| | | Fiasp | Aspart | Novo Nordisk | 2017 | $558.83 (pen[27]) $289.36 (vial[28]) |
| | Long-Acting | Lantus | Glargine | Sanofi | 2000 | $438.07 (pen[29]) $292.07 (vial[30]) |
| | | Levemir | Detemir | Novo Nordisk | 2005 | $333.12 (FlexTouch[31]) $308.14 (vial[32]) |
| | | Basaglar | Glargine | Eli Lilly | 2016 | $326.36 (pen[33]) |
| | | Toujeo | Glargine | Sanofi | 2015 | $680.27 (pen[34]) |

[23] Novolog FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[24] Novolog 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[25] Apidra SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glulisine 100U/1mL, Solution for injection).

[26] Apidra 100unit/ml Solution for Injection (vial, 10 ml Insulin Glulisine 100U/1mL, Solution for injection).

[27] Fiasp FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[28] Fiasp 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[29] Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection).

[30] Lantus 100units/mL Solution for Injection (vial, 10 ml Insulin Glargine 100U/1mL, Solution for injection).

[31] Levemir FlexTouch 100units/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection).

[32] Levemir 100units/ml Solution for Injection (vial, 10 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection).

[33] Basaglar KwikPen 100units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection).

[34] Toujeo SoloStar 300units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 1.5 ml Insulin Glargine 300U/1mL, Solution for injection).

| Table 1: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2023 (WAC) |
| | | Tresiba | Insulin Degludec | Novo Nordisk | 2016 | $508.43 (pen[35]) |

## C.    Current Insulin Treatment Landscape

77.    Today, analogs dominate insulin sales. Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas. As a result, it can be used in more flexible ways.

78.    The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

79.    For type 1 patients, insulin analogs are the best course of treatment. Doctors uniformly prescribe analogs for type 1 patients.

80.    For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin regimen."[36] Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

81.    But doctors still prefer to prescribe analog insulins to type 2 patients. A recent study found that as of 2010, among adults who filled prescriptions for more than one brand of insulin, 91.5% filled prescriptions for insulin analogs. The study found that percentage has grown

---

[35] Tresiba Insulin Degludec 200units/mL Pre-Filled Pen Solution for Injection (box, 3 pens, 3 ml Insulin Glargine 200U/1mL, Solution for injection).

[36] American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/S52?ijkey=07291605370b0a3e07418e06fb5e894fb4314f05&keytype2=tf_ipsecsha.

considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin. Now, type 2 patients use human insulin less frequently: the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.

**Figure 5: Type of insulin used among U.S. adults with type 2 diabetes (who filled more than one prescription)[37]**



82.    In 2016, the top three selling insulins were all analogs: Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and Eli Lilly's rapid-acting Humalog: $2.84 billion.

---

[37] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

**D.    Climbing Insulin List Prices**

83.    Despite the availability of many highly effective insulins, too many people living with diabetes go without proper treatment for a familiar reason: cost.

84.    Eli Lilly raised the list prices of Humalog to $530.40 for a package of pens and $510.45 for a box of cartridges by the end of 2017. Eli Lilly also raised the list prices of Basaglar to $326.36 for a package of pens by the end of 2017. Figure 6 demonstrates Eli Lilly's price increases from 2006 to 2023 for Humalog vials and pens, and Figure 7 illustrates Eli Lilly's price increases for Basaglar.

**Figure 6: Rising list prices of Humalog vials and pens from 2004-2023**



Figure 7: Rising list prices of Basaglar pens from 2016-2023

85.    Novo Nordisk's list prices for Levemir were $333.12 for a package of pens at the end of 2017 and $308.14 for a vial at the end of 2019. Novo Nordisk's list prices for Novolog sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list prices for Fiasp also sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list price for Tresiba was $508.43 for a package of pens at the end of 2019. Most diabetes patients need at least one package of insulin per month. Figures 8 and 9 demonstrate Novo Nordisk's price increases from 2006 to 2023 for Levemir and Novolog. And Figures 10 and 11 show Novo Nordisk's list price increases for Tresiba and Fiasp.

**Figure 8: Rising list prices of Levemir vials and pens from 2006-2023**





**Figure 9: Rising list prices of Novolog vials and pens from 2006-2023**





**Figure 10: Rising list prices of Tresiba pens from 2015-2023**

**Figure 11: Rising list prices of Fiasp pens from 2017-2023**



86.     Sanofi's list prices for Lantus, the top-selling analog insulin, sat at $438.07 for a package of pens and $292.07 for a vial by August 2023. Sanofi's list prices for Apidra were $548.52 for a package of pens and $283.95 for a vial at the end of 2019. Sanofi's list price for Toujeo was $680.27 for a package of Toujeo pens by August 2023. Figures 12 and 13 demonstrate Sanofi's price increases from 2004/2006 to 2019 for Lantus and Apidra vial and pen packages. Figure 14 demonstrates Sanofi's list prices increases for Toujeo.



Figure 12: Rising list prices of Lantus vials and pens from 2006-2023



**Figure 13: Rising list prices of Apridra vials and pens from 2006-2023**





**Figure 14: Rising list prices of Toujeo pens from 2015-2023**

87.    The list prices of insulin analogs have not always been so high. In just the last five years, Sanofi and Novo Nordisk have raised Lantus's and Levemir's reported prices an astounding 168% and 169%, respectively. In fact, in 2016, Novo Nordisk and Sanofi were responsible for the highest drug list price increases in the *entire pharmaceutical industry*. This distinction largely reflected their price hikes for Lantus and Levemir. Figure 15 shows Eli Lilly, Novo Nordisk, and Sanofi's exponential list price hikes from 2000 to 2015.

**Figure 15: Rising insulin list prices from 2000-2015**[38]



88.     Eli Lilly, Novo Nordisk, and Sanofi have not only dramatically increased their insulins' list prices in the last 15 years, they have done so in perfect lock-step. In thirteen instances since 2009, Sanofi and Novo Nordisk raised the list prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other."[39] As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[40] Eli Lilly, Novo Nordisk, and Sanofi have engaged in the same lock-step behavior with respect to their rapid-acting analog insulins, Humalog, Novolog, and Apidra, respectively.

89.     An example from 2014 demonstrates this behavior and shows how the defendants inflated their list prices in ways that were completely untethered from their insulins' efficacy, value, or production costs. In May 2014, Novo Nordisk's U.S. Pricing Committee (PC) discussed how to respond to Sanofi's recent pricing actions. Farruq Jafery of Novo Nordisk emailed the rest of the

---

[38] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

[39] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015).

[40] *Id.*

pricing committee, stating "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen. Based on our PC discussion on 5/19/2014, we agreed that the best strategy for Levemir® is to observe the market and maintain list price parity to competitors. As such, we will be moving forward with a 16.1% increase on Levemir® vial and a 9.9% increase on Levemir FlexPen® and FlexTouch® effective tomorrow 5/31/2014." Novo Nordisk then followed through, matching Sanofi's list price increases precisely, to the tenth of a percent. And by doing so netted the company approximately $125 million in additional revenue.[41]

90.    Novo Nordisk continued to track Sanofi's pricing actions and respond with incredible speed. In November 2014, Sanofi again raised the list price of Lantus vials and pens 11.9%; within hours, Novo Nordisk's pricing committee sought (and ultimately received) approval to raise by 11.9% the price of Levemir.[42] Rich DeNunzio of Novo Nordisk estimated the increase would generate approximately an additional $25 million in revenue to the company in 2014 (despite the hike being taken at the end of the year).[43]

91.    Figures 19 and 20 demonstrate this shadow pricing behavior with respect to Lantus and Levemir, with the entry of Eli Lilly's Basaglar, Novo Nordisk's Tresiba, and Sanofi's Toujeo noted as well. Figures 21 and 22 demonstrate this behavior with respect to Novolog, Fiasp, Humalog, and Apidra.

---

[41] Charles E. Grassley, Ron Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 54.
[42] *Id.* at 55.
[43] *Id.* at 56.

**Figure 16: Rising list prices of long-acting insulins from 2006-2023**



Figure 17: Rising Lantus and Levemir list prices from 2001-2015



**Figure 18: Rising list prices of rapid-acting insulin from 2006-2023**



**Figure 19: Rising Humalog and Novolog list prices from 1996-2016**



**E.      Eli Lilly, Novo Nordisk, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status.**

92.      In the past, Novo Nordisk maintained that its price increases reflected the "clinical benefit" of its drugs.[44] But Levemir and Novolog are the exact same drugs they were more than 10 years ago—the clinical benefits of these medications have not changed. Where clinical benefit has not changed, it cannot be used to justify a 169% price increase. Therefore, another factor motivates these list price increases.

93.      Research and development costs do not account for these list price increases as such have been a fraction of revenues. For example, during the period 2014-2018, Sanofi reported

---

[44] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/ 2016/mar-apr/rising-costs-insulin.html.

net sales of $37 billion for its insulin products with R&D costs of $902 million. In the same time period, Eli Lilly spent $395 million on R&D with $1.4 billion in sales and marketing expenses on revenues of $22.4 billion.

94.    The real reason Eli Lilly, Novo Nordisk, and Sanofi have increased their list prices is because these firms choose to compete based on hidden rebates to PBMs rather than transparent prices for all. PBMs control the formularies that determine whether people living with diabetes will purchase Eli Lilly, Novo Nordisk, and Sanofi's analog insulins. The defendants have realized that they can manipulate the PBMs' formulary choices by artificially inflating their list prices, rather than lowering net prices.

95.    Under pressure to explain its rising list prices, Novo Nordisk admitted to this behavior in a press release. On November 30, 2016, Novo Nordisk stated:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by **XX percent leads to an automatic XX percent profit** for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[45]

Explaining the company's list price increases, Novo Nordisk directly admitted that it "set[s] list price" with an eye to achieving "preferred" formulary status.

---

[45] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

96.     For over a decade, Novo Nordisk has steeply raised the list prices of Levemir and

Novolog while keeping the net prices of these medicines constant. Figures 23 and 24 (included in

Novo Nordisk's press release) illustrate this conduct.

**Figure 23: Net versus List Prices of Novolog Vials[46]**



---

Figure 24: Net versus List Prices of Novolog FlexPens[47]



97.    Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary positions: "The reason drugmakers sharply raise list prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[48]

98.    Sanofi has also conceded its participation in this list price inflation scheme:

> [S]ince 2014, we have increased the level of rebates granted for Lantus® in order to maintain favorable formulary positions with key payers in the US.[49]

99.    Sanofi's manipulation of its spreads is visible in Figure 25.

---

[47] *Id.* The FlexPen is a type of insulin injection. Patients who use this pen stick themselves with a pen-like insulin distributor instead of injecting insulin through a pump or syringe.

[48] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

[49] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2016).



Figure 25: Net versus List Price of Lantus

100.    Eli Lilly's, Novo Nordisk's, and Sanofi's spread-increasing behavior is also visible from data on these companies' "rebates" to PBMs and insurers.

101.    The two figures below illustrate Eli Lilly's "rebates" from 2007 to 2014. Figures 26 and 27 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

Figure 26: Eli Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014

Figure 27: Eli Lilly's selling, general, and administrative costs and rebates
as a percentage of gross U.S. sales from 2007-2014



102.    Novo Nordisk has also greatly increased its spreads. Figures 28 and 29 show the

amount Novo Nordisk has increased its rebates (spreads) from 2007 to 2014.

**Figure 28: Novo Nordisk's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



*Source: Company data, Credit Suisse estimates*

**Figure 29: Novo Nordisk's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**



*Source: Company data, Credit Suisse estimates*

103.     Finally, Sanofi has greatly increased its spreads. Figures 30 and 31 show the amount

Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 30: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



**Figure 31: Sanofi's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**

104.    The arbitrary and deceptive nature of the defendants' list prices are underscored by how they price drugs to achieve "parity" when a new product launches. One would expect when a new insulin hits the market, older insulins would become more affordable as some patients flock

to the newer and ostensibly more desirable medicines. But the opposite happens. Instead, drug manufacturers *inflate* the price of their older insulin products so that they can launch the newer insulins at higher prices and still ensure that consumers switch to those newer, more expensive insulins. If the drug makers did not raise the list prices of their older medications, consumers would just stay on those medications rather than making the switch to the new ones. For example, in 2014, Sanofi aggressively began raising the list price of Lantus to achieve "a single price point for Lantus . . . believing that it would remove cost as a barrier for switching patients to Toujeo to become the preferred basal insulin."[50]

105.     Sanofi and Novo Nordisk have stretched the spreads of their analog insulin medications to the point where they have become the second and third largest rebators in the entire pharmaceutical industry.

106.     Although the defendants drug manufacturers claim they "need" to inflate their list prices to obtain formulary status, this explanation omits a crucial detail. Drug companies could compete for formulary status in a manner that would help consumers and health plans: *they could significantly lower list (and net) prices*. Yet, the insulin manufacturers refuse to significantly lower their net prices. And the PBMs continue to accept the manufacturers' list-price-raising behavior so long as net prices stay constant.

107.     Indeed, upon facing pressure from lawmakers to lower their list prices in recent years, the defendants analyzed the pros-and-cons of doing so. But Novo Nordisk, for example, lamented not being able to compete without massive rebates, and feared retaliation in the supply

---

[50] Grassley & Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 51.

chain from PBMs and others who benefit from the practice of inflating list price and then buying formulary access with rebates.[51]

**F.    The defendant drug manufacturers' list price inflation is unfair, inefficient, and harms Local 464A and class members.**

108.    The defendants' inflated list prices have harmed class members. As the defendants' list prices soared further and further away from their net prices, these list prices became so misrepresentative, so untethered from their true average prices as to be unlawful.

109.    The defendant drug manufacturers concealed their analog insulins' net prices to ensure the PBMs could and would benefit from the spreads between the net and list prices. Put another way, the defendants' publication of their list prices, while concealing their net prices, is the basis for the *quid pro quo* with the PBMs. The defendants' spread schemes enabled them to offer something of value to the PBMs (large spreads on which to make profits) in exchange for preferred formulary status. If the defendants did not have these spreads to offer, they would have been forced to compete for preferred formulary status through lower list prices. Put simply, without the fraudulent spread schemes, the defendants would have competed for PBM business the way competitors do in healthy markets: by lowering the prices. Such competition would have benefited Local 464A and class members, who reimburse pharmacies based on AWP. But instead of competing on lower prices, each defendant competed on larger spread.

110.    To do so, the defendants closely guarded their pricing structures and sales figures for their analog insulins. Each defendant drug manufacturer kept secret the net prices it offered to the three largest PBMs.

---

[51] Grassley & Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 62.

111.    Each defendant also concealed its fraudulent conduct by signing confidentiality agreements with those in the supply chain that knew the net prices.

112.    In sum, each defendant concealed that: (i) its list prices were fraudulently-inflated, (ii) it was manipulating the list prices of its analog insulins, (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the analog insulins as they were sold to PBMs, and (iv) the net prices to PBMS were either held constant or else decreasing.

113.    The defendants' publication of their list prices, combined with their concealment of their net prices, deceived Local 464A and class members into believing that the analog insulins' list prices were reasonably related to the drugs' net prices.

114.    Local 464A and the class relied on the defendants' representations regarding their list prices and paid for their analog insulins based on these inflated list prices to their detriment. Local 464A and the class continue to pay for the analog insulins based on their list prices. Such payments are unfair and unconscionable given the value of these drugs as evidence by their true, net prices.

115.    As a result of the defendant drug manufacturers' deceptive, unfair, and unconscionable conduct, Local 464A and members of the class overpaid for their analog insulins when they pay for these medications based on their list prices. No other entity in the drug supply chain sets these list prices and no other entity in the supply chain has the ability to change these list prices, on which health plan payment—vis-a-vis pharmacy reimbursements—are directly based. The amount Local 464A and class members have overpaid is the difference between the price paid by Local 464A for insulin and a reasonable approximation of the drugs' net prices.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Continuing Violations Doctrine

116.    The conduct of defendants central to plaintiff's claims has not ceased; the list price-rebate scheme remains in effect. And all the relevant conduct of defendants is part of a continuing unlawful practice. Accordingly, under the continuing violations doctrine, this action is timely because the last act evidencing the continuing practice falls within the applicable limitations periods.

### B.    Fraudulent Concealment Tolling

117.    All applicable statutes of limitation have also been tolled by the defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

### C.    Estoppel

118.    The defendants were under a continuous duty to disclose to Local 464A and the class members the true character, quality, and nature of the list prices upon which their payments for insulin were based.

119.    Based on the foregoing, the defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

120.    Plaintiff brings this action on behalf of itself and all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3), as representative of a class defined as follows:

> All entities in the United States of America and its territories which, for purposes other than resale, paid or reimbursed for all or a portion of the purchase price for Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba, and/or Toujeo from 2014 to present at a price calculated by reference to the Average Wholesale Price ("AWP") and/or Wholesale Acquisition Price ("WAC").

121.     Excluded from the class are: (i) any such entity that owns or is owned by a pharmacy benefit manager that performs services for a health plan or plans other than the putative class entity, (ii) any municipal and/or local government fully self-funded prescription drug plan, (iii) the federal and state governments, (iv) fully insured health plans, i.e., plans for which the insurer bears 100% of the risk for the reimbursement obligations to members; (v) pharmacy benefit managers, (vi) natural persons and (vi) the defendants, their subsidiaries and affiliates. For purposes of this class definition, "owns or is owned by" means that at any time during the class period the entity directly or indirectly owned more than 50% of the outstanding shares of the pharmacy benefit manager, or that a pharmacy benefit manager directly or indirectly owned more than 50% of the outstanding shares of the entity. By way of clarity and to the extent not excluded above, the class includes but is not limited to self-insured non-governmental entities, third-party payers that offer insured plans to private individuals and groups, union health and welfare plans, entities that contract to provide programs for the Federal Employees Health Benefit program, sponsors of plans under Medicare Part D, and Managed Medicaid plan sponsors. Included in the class are self-insured non-governmental entities and third-party payers that offer insured plans to private individuals and groups. Likewise third-party payers that offer insured plans to government entities including the Federal Employee Program, Managed Medicaid, and Medicare Part D are class members.

122.     The class period is tolled to the earliest date of the defendant drug manufacturers' initiation of the scheme described herein, wherein the defendant drug manufacturers artificially inflated the list prices of Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba,

and Toujeo (the analog insulins) to offer PBMs higher spreads in exchange for preferred formulation status (the spread scheme).

123.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for the analog insulins throughout the United States every week, and these prescriptions are reimbursed by health plans all over the country.

124.    Local 464A's claims are typical of the claims of the members of the class. Local 464A and all members of the class were damaged by the same wrongful conduct of the defendants—i.e., as a result of defendant drug manufacturers' misconduct, these purchasers reimbursed insulin purchases at artificially inflated prices, and they will continue to do so in the future.

125.    Local 464A will fairly and adequately protect and represent the interests of the class. The interests of Local 464A are coincident with, and not antagonistic to, those of the other members of the class.

126.    Counsel that represents Local 464A are experienced in the prosecution of class action litigation and have particular experience with related insulin overpricing litigation. They are lead counsel in the consumer class action regarding the same conduct at issue in this complaint: the defendants' overpricing of their analog insulins. More broadly, counsel has a depth of class action experience involving pharmaceutical products and, in particular, the use of misuse of list prices, including two cases in federal district court (*AWP* and *McKesson*) that resulted in recoveries well in excess of $500 million.

127. Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because the defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally applicable conduct is inherent in the defendants' wrongful conduct.

128. Questions of law and fact common to the class include, but are not limited to:

    i.    Whether the Eli Lilly, Novo Nordisk, and Sanofi engaged in unfair and/or unconscionable conduct;

    ii.    Whether the Eli Lilly, Novo Nordisk, and Sanofi controlled and inflated the list price (WAC) of their insulins;

    iii.    Whether the Eli Lilly, Novo Nordisk, and Sanofi knew that the class members paid based on the list price (WAC) the defendants set;

    iv.    Whether the Eli Lilly, Novo Nordisk, and Sanofi knew that the increased cost of insulin harmed the class members;

    v.    Whether the class members could reasonably avoid purchase of the insulins they reimbursed;

    vi.    Whether the Eli Lilly, Novo Nordisk, and Sanofi took advantage of the class members' inability to forgo paying for their members' insulin purchases;

    vii.    Whether Eli Lilly, Novo Nordisk, and Sanofi competed with one another through rebates to PBMs and insurers rather than reductions to list prices;

    viii.    Whether Eli Lilly, Novo Nordisk, and Sanofi paid kickbacks, disguised as "rebates," to PBMs, such as CVS Health, Express Scripts, and OptumRX, that created substantial spreads between the list and net prices;

    ix.    Whether Eli Lilly, Novo Nordisk, and Sanofi used artificially inflated list prices as a starting point for negotiating these kickbacks or "rebates" for the analog insulins;

    x.    Whether Local 464A and class members made inflated payments based on the artificial list prices for the analog insulins;

xi.  Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in shadow pricing, matching their competitors' price increases such that all rapid- and long-acting insulins were infected by the scheme;

xii.  Whether the defendants have misled plaintiff, the class, and the public regarding the justifications and driving forces behind their list price increases;

xiii.  Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in a pattern of deceptive and/or fraudulent activity intended to defraud or deceive plaintiff and class members;

xiv.  Whether Eli Lilly, Novo Nordisk, and Sanofi are liable to plaintiff and class members for damages for conduct actionable under the various state consumer protection statutes; and

xv.  Whether Eli Lilly, Novo Nordisk, and Sanofi are liable to plaintiff and the class members for damages flowing from their misconduct.

129.  Local 464A and members of the class have all suffered, and will continue to suffer, harm and damage as a result of the defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated health plans to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally, defendants have acted and failed to act on grounds

generally applicable to Local 464A and the class and require court imposition of uniform relief to ensure compatible standards of conduct toward the class, thereby making appropriate equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

130. Local 464A knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

131. The defendant drug manufacturers concealed their analog insulins' net prices and prevented Local 464A and class members from knowing what these prices were to ensure the defendant drug manufacturers would not have to meaningfully lower the net prices of their analog insulins. And so that PBMs could and would benefit from the spreads between the net and list prices. Put another way, the defendants' publication of their list prices, while concealing their net prices, is the basis for the *quid pro quo* with the PBMs. The defendants' spread schemes enabled them to offer something of value to the PBMs (large spreads on which to make profits) in exchange for preferred formulary status. If the defendants did not have these spreads to offer, they would have been forced to compete for preferred formulary status through lower list prices. Put simply, without the fraudulent spread schemes, the defendants would have competed for PBM business the way competitors do in healthy markets: by lowering the prices. Such competition would have benefited Local 464A and class members, who reimburse pharmacies based on AWP. But instead of competing on lower prices, each defendant competed on larger spread.

132. To do so, the defendants closely guarded their pricing structures and sales figures for their analog insulins. Each defendant drug manufacturer kept secret the net prices it offered to the three largest PBMs.

133.     Each defendant also concealed its fraudulent conduct by signing confidentiality agreements with those in the supply chain that knew the net prices.

134.     In sum, each defendant concealed that: (i) its list prices were fraudulently-inflated, (ii) it was manipulating the list prices of its analog insulins, (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the analog insulins as they were sold to PBMs, and (iv) the net prices to PBMs were either held constant or else decreasing.

135.     The defendants' publication of their list prices, combined with their concealment of their net prices, deceived Local 464A and class members into believing that the analog insulins' list prices were reasonably related to the drugs' net prices.

136.     Local 464A and the class relied on the defendants' representations regarding their list prices and paid for their analog insulins based on these inflated list prices to their detriment. Local 464A and the class continue to pay for the analog insulins based on their list prices. Such payments are unfair and unconscionable given the value of these drugs as evidence by their true, net prices.

137.     As a result of the defendant drug manufacturers' deceptive, unfair, and unconscionable conduct, Local 464A and members of the class overpaid when covering member analog insulin purchases based on their list prices. No other entity in the drug supply chain sets these list prices and no other entity in the supply chain can change these list prices, on which health plan payments for insulin are directly based. The amount Local 464A and class members have overpaid is the difference between the price paid by Local 464A for insulin  and a reasonable approximation of the drugs' net prices.

## VIII.    CLAIMS FOR RELIEF

### COUNT ONE VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

138.    Plaintiff, on behalf of itself and all others similarly situated, re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this amended complaint.

139.    Plaintiff, on behalf of itself and all others similarly situated, assert this claim only on behalf of health plans that paid for analog insulins purchased directly from the PBMs Express Scripts, CVS Health, or OptumRx in their mail-order pharmacies. And plaintiff, on behalf of itself and all others similarly situated, assert this claim only to recover for those health plan purchases made from PBM-run mail order pharmacies. Because plaintiff, and/or similar health plans, purchased analog insulins directly from PBMs, via their mail order pharmacies, they made direct purchases from the RICO enterprises described below.

140.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

**A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under RICO.**

141.    Local 464A brings this count against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf the class and alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c).

142.    Local 464A, the members of class, Eli Lilly, Novo Nordisk, and Sanofi are all "persons," as that term is defined in 18 U.S.C. § 1961(3).

143.    The following pharmacy benefit managers are each "persons," as that term is defined in 18 U.S.C. § 1961(3): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

**B.    The Manufacturer-PBM Insulin Pricing RICO Enterprises**

144.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) *one* of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) *one* of the defendant drug manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

145.    Each of the Manufacturer-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of selling, purchasing, and administering the analog insulins to the plaintiff and class members and deriving secret profits from these activities (the spread scheme). These profits are greater than either the defendant drug

manufacturers or the PBMs could obtain absent their fraudulent concealment of the substantial rebates from defendant drug manufacturers to PBMs.

146.    To accomplish this common purpose, the defendant drug manufacturers periodically and systematically inflate the list prices of the analog insulins. They did so willfully, and with knowledge that class members make payments directly based on the manufacturers' list price. The Manufacturer-PBM Insulin Pricing Enterprises then held out their list prices—to the general public, consumers, and payors, including Local 464A and the class—as reasonable representations of the actual cost of these medicines.

147.    It is this scheme that is fraudulent. The defendant drug manufacturers' benchmark prices no longer represent a reasonable approximation of the actual price of insulin, and the Manufacturer-PBM Insulin Pricing Enterprises concealed the magnitude of the spreads between benchmark prices and net prices from the plaintiff and the class. The Manufacturer-PBM Insulin Pricing Enterprises also concealed from the public the purpose of these spreads: the spreads ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring significant price reductions; and they result in higher profits for the PBMs, whose earnings increase as the spread between list and net prices grows.

148.    Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin list prices as the basis for cost-sharing and out-of-pocket payments in the pharmaceutical industry. With respect to the defendant drug manufacturers, these corporations would not be able to market large spreads to PBMs in exchange for favorable formulary positions without the use of the inflated list prices as the basis for health plan payments and/or cost-sharing at the point of sale in the pharmaceutical industry. The PBMs share this common purpose

because, without the use of the inflated list prices, their profits on the spread between list and net prices would collapse. As a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into two general categories: (i) they keep the difference between what they pay pharmacies for drugs, which is negotiated as a percentage of list price plus dispensing costs, and what insurers pay them, which is a higher percentage of list price plus dispensing costs; (ii) they pocket a percentage of the "spread" between prices.

149.    Each of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each defendant drug manufacturer and each PBM that is an associate. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, there is a common communication network by which each defendant drug manufacturer and each PBM share information on a regular basis, including information regarding the analog insulin list prices and net prices. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, each defendant drug manufacturer and each PBM functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Insulin Pricing Enterprises was operated by the specific defendant drug manufacturer for criminal purposes, namely, carrying out the spread scheme.

150.    At all relevant times, the PBMs have been aware of the Manufacturer-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct, and have reaped profits from that conduct. The PBMs strike rebate deals with the defendant drug manufacturers to conceal the true net prices of the analog insulins and profit from the inflated list prices. The PBMs have represented to the public that the rebates they negotiate save health care

payers and their plan members (including plaintiff and members of the class) money on their prescription needs. But they have known that the increasing spreads did not and do not actually decrease the net prices of the analog insulins: the list prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the Manufacturer-PBM Insulin Pricing Enterprises' common purpose of enlarging the hidden spreads between net and list price, the PBMs would have had the incentive to disclose the fraudulence of the defendant Manufacturers' list prices. By failing to disclose this information, the PBMs and defendant drug manufacturers perpetuated the conduct of the Manufacturer-PBM Insulin Pricing Enterprises.

151.    Further, the PBMs took instructions and commands from the defendant drug manufacturers regarding use of the analog insulin list prices, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) access rebates for placement of products on their formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants in an effort to promote products.

152.    In order to garner all of these fees from the defendant drug manufacturers, each PBM and each defendant drug manufacturer meet on a regular basis to discuss analog insulin prices, spreads, marketing opportunities, and coordination of all of the above.

153.    There is a common communication network between each PBM and each manufacturer for the purpose of implementing the rebate scheme and for the exchange of financial rewards for the PBM activities that benefit the defendant drug manufacturers.

154.    At all relevant times, each one of the PBMs was aware of the defendants drug manufacturers' spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

155.    For purposes of this count, the Manufacturer-PBM Insulin Pricing Enterprises are further identified as follows:

**1.    The Eli Lilly-PBM Enterprises**

156.    The Eli Lilly-PBM Enterprises are three separate associations-in-fact consisting of each of the PBMs that administers purchases of Eli Lilly's Humalog and Basaglar, including its directors, employees, and agents, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-CVS association-in-fact enterprise; (2) the Eli Lilly-Express Scripts association-in-fact enterprise; and (3) the Eli Lilly-OptumRx association-in-fact enterprise. Each of the Eli Lilly-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Eli Lilly's rapid-acting analog insulin product, Humalog, and it's long-acting analog insulin product, Basaglar, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx. As to each of these Eli Lilly-PBM Enterprises, there is a common communication network by which Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx share information on a regular basis. As to each of these Eli Lilly-PBM Enterprises, Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx function as continuing

but separate units. At all relevant times, each of the Eli Lilly-PBM Enterprises was operated and conducted by Eli Lilly for criminal purposes, namely, carrying out the spread scheme.

### 2.    The Novo Nordisk-PBM Insulin Pricing Enterprises

157.    The Novo Nordisk-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Novo Nordisk's Fiasp, Novolog, Levemir, and Tresiba including its directors, employees, and agents, and Novo Nordisk, including its directors, employees and agents: (1) the Novo Nordisk-CVS association-in-fact enterprise; (2) the Novo Nordisk-Express Scripts association-in-fact enterprise; and (3) the Novo Nordisk-OptumRx association-in-fact enterprise. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog insulin products, Levemir and Tresiba, and its rapid-acting analog insulin products, Fiasp and Novolog, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, there is a common communication network by which Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx share information on a regular basis. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx function as continuing but separate units. At all

relevant times, each of the Novo Nordisk-PBM Insulin Pricing Enterprises was operated and conducted by Novo Nordisk for criminal purposes, namely, carrying out the spread scheme.

### 3. The Sanofi-PBM Insulin Pricing Enterprises

158.    The Sanofi-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Sanofi's Apidra, Lantus, and Toujeo, including its directors, employees, and agents, and Sanofi, including its directors, employees and agents: (1) the Sanofi-CVS association-in-fact enterprise; (2) the Sanofi-Express Scripts association-in-fact enterprise; and (3) the Sanofi-OptumRx association-in-fact enterprise. Each of the Sanofi-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Sanofi-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx. As to each of these Sanofi-PBM Insulin Pricing Enterprises, there is a common communication network by which Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx share information on a regular basis. As to each of these Sanofi-PBM Insulin Pricing Enterprises, Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx function as continuing but separate units. At all relevant times, each of the Sanofi-PBM Insulin Pricing Enterprises was operated and conducted by Sanofi for criminal purposes, namely, carrying out the spread scheme.

159.    The Manufacturer-PBM Insulin Pricing Enterprises (Eli Lilly-CVS, Eli Lilly-Express Scripts, Eli Lilly-OptumRx, Novo Nordisk-CVS, Novo Nordisk-Express Scripts, Novo-Nordisk-OptumRx, Sanofi-CVS, Sanofi-Express Scripts, and Sanofi-OptumRx) knowingly made material misrepresentations and omissions to class members in furtherance of the fraudulent scheme regarding:

a.    The net prices of the analog insulins;[52]

b.    The extent to which the net prices of the analog insulins departed from their artificially-inflated list prices;

c.    That the analog insulins' list prices served as a reasonable and fair basis for health plan payments for analog insulins purchased by health plan participants at mail-order pharmacies;

d.    The extent to which the defendant drug manufacturers and the PBMs negotiated the rebates discounting the list prices of the analog insulins in good faith and for a proper purpose;

e.    Whether the rebates—as opposed to lower list prices—saved health plans and the general public money;

f.    Whether the "preferred" formulary status of the analog insulins reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' formulary committees;

---

[52] The Eli Lilly-PBM Enterprises made these misrepresentations with respect to Humalog and Basaglar. The Novo Nordisk-PBM Insulin Pricing Enterprises made these representations with respect to Fiasp, Novolog, Levemir, and Tresiba. The Sanofi-PBM Enterprises made these misrepresentations with respect to Apidra, Lantus, and Toujeo. All references to "analog insulins" refer to the specific insulins relevant to each manufacturer PBM enterprise.

g.    Whether the analog insulins would have been placed in "preferred" formulary positions absent the spreads; and

h.    The extent to which the spread schemes forced plaintiff and the class members to incur additional expenses for their analog insulin prescriptions.

160.    The defendant drug manufacturers alone could not have accomplished the purposes of the Manufacturer-PBM Insulin Pricing Enterprises without the assistance of the PBMs. For the defendant drug manufacturers to profit from the scheme, the PBMs needed to convince health plan, like the plaintiff, to select their formularies, on which varying analog insulins were given favorable treatment. And the PBMs did so by telling health plans (including the plaintiff), potential clients, and investors that they secured lower prices. The lower prices were illusory, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the Manufacturer-PBM Enterprise could not have achieved its common purpose.

161.    The impacts of the Manufacturer-PBM Insulin Pricing Enterprises are still in place, i.e., the increased spreads between the benchmark and net prices of the analog insulins are still being maintained.

162.    The foregoing evidences that the defendant drug manufacturers and PBMs were each willing participants in the Manufacturer-PBM Insulin Pricing Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprises' purposes, i.e., to increase profits for both the defendant drug manufacturers and the PBMs through kickbacks to the PBMs and continued formulary status without net price reductions for the defendant drug manufacturers.

C.    **The Manufacturer-PBM Insulin Pricing RICO Enterprises  use of the U.S. mails and interstate wire facilities**

163.    Each of the Manufacturer-PBM Insulin Pricing Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries: the sale, purchase and/or administration of the analog insulins; the setting of the prices of the analog insulins; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for the analog insulins by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of the analog insulins. During the class period, the Manufacturer-PBM Insulin Pricing Enterprises participated in the administration of the analog insulins to millions of individuals located throughout the United States.

164.    During the class period, Eli Lilly, Novo Nordisk, and Sanofi's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

165.    The nature and pervasiveness of the defendant drug manufacturers' spread scheme, which was orchestrated out of the corporate headquarters of the defendant drug manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the PBMs.

166.    Most of the precise dates of defendant drug manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these defendants' books and records. Indeed, an essential part of the successful operation of the spread scheme alleged herein depended upon

secrecy, and as alleged above. And the defendant drug manufacturers took deliberate steps to conceal their wrongdoing. However, the plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the spread scheme.

167.    The defendant drug manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the spread scheme involved thousands of communications throughout the class period including, inter alia:

a.    Marketing materials about the list prices for the analog insulins and the available spreads, which defendant drug manufacturers sent to PBMs located across the country;

b.    Written and oral representations of the analog insulin list prices that the defendant drug manufacturers made at least annually and, in many cases, several times during a single year;

c.    Thousands of written and oral communications discussing, negotiating, and confirming the placement of a defendant drug manufacturer's analog insulin or insulins on a particular PBM's formulary;

d.    Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBMs paid for the analog insulins, and/or to conceal those prices or the spread scheme;

e.    Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBMs to persuade them to advocate one defendant drug manufacturers' analog insulin over a competitor's product;

f.      Written and oral communications with U.S. government agencies and private

insurers that fraudulently misrepresented what the list prices were, or that were intended to

deter investigations into the true nature of the list prices or to forestall changes to

reimbursement based on something other than list prices;

g.      Written and oral communications with health insurers and patients;

h.      Transmission of list prices from manufacturers to third parties.

i.      Receipts of money on tens of thousands of occasions through the U.S. mails and

interstate wire facilities—the wrongful proceeds of the defendant drug manufacturers'

spread scheme; and

j.      In addition to the above-referenced RICO predicate acts, Defendants' corporate

headquarters have communicated through use of the U.S. mails and by interstate wire

facilities with their various local headquarters or divisions, in furtherance of the spread

scheme. These mails include some of the documents referenced in this Third Amended

Complaint.

## D.     Conduct of the RICO Enterprises' affairs

168.    During the class period, each of the defendant drug manufacturers has exerted

control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated

and, in violation of Section 1962(c) of RICO, each of the defendant drug manufacturers have

conducted or participated in the conduct of the affairs of those association-in-fact RICO

enterprises, directly or indirectly. Such participation was carried out in the following ways:

a.      Each of the defendant drug manufacturers has directly controlled the list and net

prices for its analog insulins, which determines the amount of each of the PBMs'

compensation;

b.      Each of the defendant drug manufacturers has directly controlled the lists prices that it publicly reports;

c.      Each of the defendant drug manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its analog insulins;

d.      Each of the defendant drug manufacturers has relied upon its employees and agents to promote the spread scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

e.      Each of the defendant drug manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Insulin Pricing Enterprises with which it is associated by providing rebates (as detailed above) or other inducements to place that defendant drug manufacturer's analog insulin or insulins on a PBM's formulary or advocate the use of a certain analog insulins. These inducements include the defendant drug manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, PBMs usually refuse to disclose specific rebate amounts associated with individual drugs to health plans, such as the plaintiff here. Instead, the PBMs typically disclose rebates in an aggregate compared to performance standards, thereby preventing the health plan, including the plaintiff here, from learning the true value of the rebates the PBM has received in connection with the analog insulins. Such a lack of transparency obfuscates the

delta between the defendant drug manufacturers' list prices and their net prices so that the health plans, including the plaintiff, have no way to ascertain whether the prices they are paying for the analog insulins are fair and competitive.

f.    The defendant drug manufacturers intended that the PBMs would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers, like the plaintiff and class members, money on their prescription needs; and

g.    The defendant drug manufacturers represented to the general public, by stating the analog insulins' list prices without stating that these list prices differed substantially from those net prices offered to the PBMs, that the analog insulins' list prices reflected and/or represented true prices for those drugs.

169.    Each of the Manufacturer-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by the respective defendant drug manufacturer.

170.    In violation of Section 1962(c) of RICO, each of the defendant drug manufacturers has conducted the affairs of each of the Manufacturer-PBM Insulin Pricing Enterprises with which they associated by reporting fraudulently inflated list prices for the analog insulins and by misrepresenting to the plaintiff and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member payments for analog insulins, thereby inducing the plaintiff and class members to pay inflated amounts for the analog insulins.

**E.    The defendant drug manufacturers' pattern of racketeering activity**

171.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail

fraud, and 18 U.S.C. § 1343, relating to wire fraud. The defendant drug manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their spread schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the defendant drug manufacturers intended to defraud the plaintiff, members of the class, and other intended victims of the spread scheme.

172.    Each defendant drug manufacturer's fraudulent and unlawful spread scheme consisted, in part, of deliberately overstating the list prices for its analog insulins, thereby creating a spread between net and list prices. Each defendant drug manufacturers then used those spreads to induce each of the PBMs to advocate and favor that particular defendant drug manufacturer's drugs.

173.    The spread scheme was calculated and crafted such that plaintiff and members of the class would pay for the analog insulins based on the artificially inflated, list prices. In designing and implementing the spread scheme, the defendant drug manufacturers were cognizant, at all times, of the fact the plaintiff and class members were not part of the enterprise and relied upon the integrity of the defendant drug manufacturers in setting the list prices.

174.    By intentionally and artificially inflating the list prices, and by subsequently failing to disclose such practices to the plaintiff and class members, each of the defendant drug manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

175.    The defendant drug manufacturers' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive the plaintiff and members of the class. Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the defendant drug manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including the plaintiff and members of the class. Each of the defendant drug manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Insulin Pricing Enterprises with which each of them is and was associated in fact.

176.    The defendant drug manufacturers' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

177.    The Anti-Kickback Statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

178.     The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has increased the benchmark price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM can make more money. This is a classic kickback.

## F.     The defendant drug manufacturers' motive

179.     The defendant drug manufacturers' motive in creating and operating the spread scheme and conducting the affairs of the Manufacturer-PBM Insulin Pricing Enterprises described herein was to fraudulently obtain sales of and profits from their analog insulins.

180.     The spread scheme was designed to, and did, encourage PBMs to advocate the use of the defendant drug manufacturers' analog insulins. Thus, each of the defendant drug manufacturers used the spread scheme to sell more of its drugs, thereby fraudulently gaining sales, marketplace share, and profits.

## G.     Damages caused by the defendant drug manufacturers' rebate scheme

181.     The defendant drug manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused the plaintiff and members of the class to be injured in their business or property. The plaintiff and class members have overpaid many hundreds of millions of dollars based on the defendants' deceptive list prices for their analog insulins. Each defendant intended and foresaw that the plaintiff and class members would make such payments tied directly to the defendants' list prices.

182.    The defendant drug manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported the list prices and other information by the same methods in furtherance of their spread scheme. The plaintiff and members of the class have made inflated payments for the analog insulins based on and/or in reliance on reported and false list prices.  As previously explained, when a participant fills a prescription for one of the analog insulins at CVS, Express Scripts, or OptumRx mail-order pharmacy, her health plan is responsible for a portion or nearly all of the medication's cost. And the health plans pay directly from CVS, Express Scripts, or OptumRx, an enterprise member here for the insulin.

183.    The amount of each of these payments is tied directly to the defendant drug manufacturers' list prices. No other intermediary in the supply chain has control over or is responsible for the list prices on which health plan payments are based at the point of sale. By setting the list prices of the analog insulins, the defendants are setting the prices the plaintiff and class members must pay. Therefore, when each defendant drug manufacturer artificially inflates each analog insulin's list price and then uses each Manufacturer-PBM Insulin Pricing Enterprises to sell those analog insulins, they also artificially inflate the plaintiff's and class members' payments for those drugs.

184.    The plaintiff's and class members' damages are therefore the difference between the defendants' reported benchmark prices and the net prices at which they sell their analog insulins to all plaintiff and class member cost-sharing payments at the pharmacy point of sale.

185.    As previously explained, the plaintiff, like the proposed class members it represents, receives and received rebates from its PBM on a lump sum basis across all the drugs it purchases from a given pharmaceutical company (it does not receive individual rebates on specific drugs).

Consequently, the plaintiff and like class members have no way of ascertaining the true net prices of the analog insulins. This lack of transparency results in two harms.

186.    First, the lack of transparency obfuscates the difference between the defendants' list and net prices such that the health plans, including the plaintiff, cannot ascertain whether the prices they pay for the analog insulins are fair and competitive.

187.    Second, this opaque dual pricing system has misled the plans into believing they are receiving a better deal on the analog insulins than they are actually receiving. The defendant insulin manufacturers and the PBMs have told health plans, like the plaintiff here, that the latter is benefiting from a system of high list prices and rebates—that the health plans are obtaining lower prices for the analog insulins than they would absent the rebates. This narrative is wrong. If the defendants were required to publish a list price that approximated their true net prices, the defendants would have to start competing through significantly lower *net* prices, rather than significantly inflated *list* prices. Despite selling interchangeable products, defendants have managed to escape the usual consequence of competition: lower prices. Their list price manipulation has enabled them to keep the net prices for the analog insulins the same for decades, despite stiff competition. Clear, transparent pricing would force the defendants to compete on, and therefore lower, net price, benefiting both the plaintiff here and consumers.

188.    Plaintiff's injuries, and those of the class members, were proximately caused by the defendant drug manufacturers' racketeering activity. But for the misrepresentations that the defendant drug manufacturers made regarding the list prices of their analog insulins and the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, the plaintiff and others similarly situated would have paid less for the analog insulins.

189.    The defendant drug manufacturers racketeering activity directly and proximately caused the plaintiff's injuries.

190.

191.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the defendant drug manufacturers are jointly and severally liable to the plaintiff and members of the class for three times the damages that the plaintiff and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

192.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the plaintiff and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue, the plaintiff will continue purchasing the defendants' analog insulin medications, and the plaintiff and members of the class will continue to pay based on the defendants' fraudulent benchmark prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. The plaintiff will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting benchmark prices that do not approximate their true net prices.

## COUNT TWO

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. STAT. ANN. § 56:8-1, *ET SEQ.*
### (Against Novo Nordisk and Sanofi on behalf of a nationwide class)

193.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

194.    Novo Nordisk is a corporation with its headquarters in Plainsboro, New Jersey. Sanofi is a corporation with its headquarters in Bridgewater, New Jersey. New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries"[53] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[54] Furthermore, New Jersey has some of the "strongest consumer protection laws in the nation."[55] Therefore, although other states may have some interest in protecting their own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[56]

195.    Plaintiff seeks in this Count a nationwide class applying New Jersey law to the claims against Novo Nordisk and Sanofi.

---

[53] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[54] *Kalow & Springut LLP v. Commence Corp.*, No. 07-3442 (JEI/AMD), 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, No. 04-2152, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[55] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

[56] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

196.    In addition to prohibiting fraudulent and deceptive conduct, the NJCFA prohibits unfair or unconscionable conduct.

197.    Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[57] Unconscionable practices include performance of an agreement, in addition to inducing a purchase.[58] Charging a price far in excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the NJCFA.[59]

198.    As the Third Circuit recently recognized, "unfair" and "unconscionable" business practices are "a category of business practices entirely separate from practices that are fraudulent, deceptive, or misleading" prohibited under the NJCFA.[60] The NJCFA "prohibit[s] business practices that are 'unfair' or 'unconscionable' in addition to practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them."[61]

199.    As is set forth above, the prices Local 464A and class members reimburse for analog insulin, based on their list prices, have been skyrocketing. This overpayment is a result of

---

[57] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

[58] *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. April 18, 2011) (citing *New Mea Constr. Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

[59] *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Grp., LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equip. Rental*, No. 06-cv-03830, 2012 WL 12906183 (D.N.J. June 25, 2012).

[60] *Cottrell v. Alcon Labs.*, 874 F.3d 154, 165 (3d Cir. 2017).

[61] *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, "even if no person was in fact misled or deceived thereby").

Novo Nordisk's and Sanofi's spread scheme, wherein they sell larger list prices, and therefore spreads, to the largest PBMs in exchange for preferred formulary positions.

200.     The analog insulins Novo Nordisk and Sanofi are selling have not changed since they entered the marketplace in the 1990s and 2000s. These analog insulins are no more effective and provide no more benefit than they did decades ago. Nonetheless, Novo Nordisk and Sanofi have exponentially increased their list prices.

201.     There is no economic or technological reason why analog insulin would have become more expensive to produce during the period outlined above. Indeed, with technological advances and economies of scale, the per-unit cost of analog insulin should have gone down during the same period that Novo Nordisk and Sanofi were drastically raising prices.

202.     Novo Nordisk and Sanofi were able to raise the list prices of insulin because health plans who cover patients living with diabetes literally have no choice but to purchase the prescribed analog insulins. If they do not, plan members will die, and Novo Nordisk and Sanofi know it. Even cutting back on analog insulins to save money, as is described above, can lead to serious health consequences.

203.     These actions are made even more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, giving Novo Nordisk, Sanofi, and PBMs more people off whom they can take advantage. Moreover, Novo Nordisk and Sanofi know that the other has not and will not compete based on real reductions in net price; each prefers to compete on inflation of list prices. Even in the absence of collusion, it is in each of Novo Nordisk's and Sanofi's individual best interest not to compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all three.

204.    Local 464A, on behalf of the class, therefore alleges that Novo Nordisk and Sanofi, in violation of N.J. Stat. Ann. § 56:8-2, have engaged in an unconscionable commercial practice in connection with their sale and pricing of the analog insulins.

205.    Local 464A and other class members have suffered ascertainable losses as a result of the defendants' unfair and unconscionable act complained of herein. Under N.J. Stat. Ann. § 56:8-19, they are entitled to relief in the amount of Novo Nordisk's and Sanofi's overcharges: the difference between the list prices for their analog insulins and a reasonable approximation of their net prices. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[62] Furthermore, "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[63] Therefore, Local 464A is entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

---

[62] N.J. Stat. Ann. § 56:8-19.

[63] *Id.*

## COUNT THREE

### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
### ARIZ. REV. STAT. § 44-1521, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

206.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

207.    The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."[64]

208.    The defendants, plaintiff, and class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

209.    Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

210.    The defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

211.    As alleged in this complaint, the defendants have employed "deception," "fraud, false pretense, false promise, misrepresentation, [and/]or concealment"[65] with respect to their analog insulins.

---

[64] Ariz. Rev. Stat. § 44-1522(A).

[65] *Id.*

212.    The defendant drug manufacturers' conduct, as described in this complaint, also constitutes "unfair act[s]."[66]

213.    Pursuant to the Arizona CFA, Local 464A seeks monetary relief against each defendant in an amount to be determined at trial. Local 464A also seeks punitive damages because the defendants have engaged in conduct that is wanton, reckless, or shows spite or ill-will,[67] and/or acted with reckless indifference to the interests of others.[68]

214.    Plaintiff also seeks an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT FOUR

### VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### ARK. CODE § 4-88-101, *ET SEQ.*
### (Against Eli Lilly and Novo Nordisk)

215.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

216.    The Arkansas Deceptive Trade Practices Act (Arkansas DTPA) prohibits "[d]eceptive and unconscionable trade practices,"[69] which include, but are not limited to, "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade."[70] The Arkansas DTPA also prohibits "[k]nowingly taking advantage of a consumer who is

---

[66] *Id.*

[67] *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 577 (1974); *Lufty v. R. D. Roper & Sons Motor Co.*, 57 Ariz. 495, 115 P.2d 161 (1941).

[68] *See Sellinger*, 110 Ariz. at 577; *McNelis v. Bruce*, 90 Ariz. 261 (1961).

[69] Ark. Code. § 4-88-107(a).

[70] *Id.* § 4-88-107(a)(10).

reasonably unable to protect his or her interest because of: (A) Physical infirmity; (B) Ignorance; . . . or (E) A similar factor."[71] The statute further bars, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission."[72]

217.    Defendants, plaintiff, and class members are "persons" within the meaning of Ark. Code § 4-88-102(5).

218.    Each drug at issue constitutes "goods" within the meaning of Ark. Code § 4-88-102(4).

219.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unconscionable" and "deceptive" acts in violation of the Arkansas DTPA.

220.    Plaintiff seeks monetary relief against defendants in an amount to be determined at trial. Plaintiff also seeks punitive damages because defendants acted wantonly in causing plaintiff's and class members' injuries or with such a conscious indifference to the consequences that malice may be inferred.

221.    Plaintiff also seeks an order enjoining defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

---

[71] *Id.* § 4-88-107(a)(8).
[72] *Id.* § 4-88-108.

## COUNT FIVE

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

222.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

223.    California Business and Professions Code § 17200 (UCL) prohibits "unlawful, unfair, or fraudulent business acts or practices."

224.    The defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, as described above.

225.    Defendants also violated the "fraudulent" prong of § 17200 through their pricing fraud, as described throughout this complaint.

226.    In addition, the defendants violated the "unfair" prong of § 17200[73] because the defendants' acts and practices described in this complaint, including artificial inflation of list prices to offer large rebates to the PBMs, caused the defendant drug manufacturers to profit at the expense of the plaintiff and class members.

227.    The California courts have set out several definitions of unfairness. The defendant drug manufacturers' conduct is unfair under each of them:

a.      "[T]he consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[74]

---

[73] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." (internal quotation marks and citation omitted)).

[74] *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).

b.      The defendant drug manufacturers' conduct "offends an established public policy [the FTC Policy Statement on Unfairness] or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[75]

c.      Local 464A's claim is predicated upon public policy which is "'tethered' to specific constitutional, statutory or regulatory provisions."[76]

228.    The defendants' actions, as set forth above, occurred within the conduct of their business and in trade or commerce.

229.    Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute.

230.    Local 464A requests that this Court enter such orders or judgments as may be necessary, including: a declaratory judgment that each defendant has violated the UCL; an order enjoining the defendants from continuing their unfair, unlawful, and/or fraudulent trade practices; an order restoring to Local 464A any money lost as result of each defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits the defendants received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

---

[75] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001)).

[76] *See West*, 214 Cal. App. at 806 (quoting *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003)).

231.     In addition, under Cal. Civ. Proc. Code § 1021.5, the Court "may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

## COUNT SIX

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### COLO. REV. STAT. § 6-1-101, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

232.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

233.     The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business including, but not limited to: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."[77]

234.     Each defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

---

[77] Colo. Rev. Stat. § 6-1-105(1).

235.    Plaintiff and class members are "consumers" for purposes of Colo. Rev. Stat. § 6-1-113(1)(a).

236.    Each defendant's conduct, as set forth above, occurred in the conduct, trade, or commerce.

237.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction"[78] in violation of the Colorado CPA.

238.    Under Colo. Rev. Stat. § 6-1-113, plaintiff seeks monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages and (b) statutory damages in the amount of $500 for each plaintiff or class member.

239.    Plaintiff also seeks an order enjoining each defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

---

[78] *Id.*

## COUNT SEVEN

### VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### CONN. GEN. STAT. § 42-110A, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

240.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

241.    The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[79]

242.    Each defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

243.    The defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

244.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts in violation of the Connecticut UTPA.

245.    Local 464A and class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

246.    The defendants acted with reckless indifference to another's rights or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

---

[79] Conn. Gen. Stat. § 42-110b(a).

247.    Plaintiff also seeks an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Conn. Gen. Stat. § 42-110g(d).

## COUNT EIGHT

### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### DEL. CODE TIT. 6, § 2513, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

248.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

249.    The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."[80]

250.    Each defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

251.    The defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

252.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins violated the Delaware CFA.

---

[80] Del. Code tit. 6, § 2513(a).

253.    Local 464A seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of each defendant's unlawful conduct.[81] Local 464A also seeks an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

254.    The defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

### COUNT NINE

**VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT**
**D.C. CODE § 28-3901, *ET SEQ.***
**(Against Novo Nordisk and Sanofi)**

255.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

256.    The Consumer Protection Procedures Act (District of Columbia CPPA) states: "it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia*: "(f) fail to state a material fact if such failure tends to mislead"; "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead"; "(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time"; or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices."[82]

257.    Each defendant is a "person" under D.C. Code § 28-3901(a)(1).

---

[81] *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).
[82] D.C. Code § 28-3904.

258.    Local 464A and class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased the analog insulins at issue.

259.    The defendants' actions as set forth in this complaint constitute "trade practices" under D.C. Code § 28-3901.

260.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins: "fail[ed] to state a material fact"—the true cost of the analog insulins—and that "failure tended to mislead"; "[u]se[d] innuendo or ambiguity as to a material fact, which ha[d] a tendency to mislead"; "ma[d]e false or misleading representations of fact concerning the reasons for, existence of, [and/or] amounts of price reductions, or the price in comparison to price of . . . [their] own price at a past or future time"; and "falsely state[d] the reasons for offering or supplying goods or services at sale or discount prices."[83]

261.    Local 464A and class members are entitled to recover: treble damages or $1,500, whichever is greater; punitive damages; reasonable attorneys' fees; and any other relief the court deems proper under D.C. Code § 28-3901.

262.    Local 464A seeks punitive damages against the defendants because the defendants' conduct evidences malice and/or egregious conduct. The defendants misrepresented the actual prices of their analog insulins, inflated their benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of the plaintiff and class members. The defendants manipulated the prices of their life-saving products without regard to the impact of their scheme on health plan's and their beneficiaries' ability to afford medicines

---

[83] *Id.*

necessary to sustain their life. The defendants' conduct constitutes malice warranting punitive damages.

## COUNT TEN

**VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT FLA. STAT. § 501.201, *ET SEQ.***
**(Against Eli Lilly, Novo Nordisk, and Sanofi)**

263.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

264.    The Florida Unfair and Deceptive Trade Practices Act (FUDTPA) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[84]

265.    In outlawing unfair acts or practices, the Florida Legislature adopted the FTC's interpretations of § 5(a)(1) of the Federal Trade Commission Act.[85] The Legislature specifically stated that a violation of FUDTPA "may be based upon . . . [t]he standards of unfairness . . . set forth and interpreted by the Federal Trade Commission or the federal courts."[86]

266.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the FUDTPA.

267.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the FUDTPA.[87]

---

[84] Fla. Stat. § 501.204(1).

[85] *Id.* § 501.204(2).

[86] *Id.* § 501.203(3)(b).

[87] *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice" under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and noting a separate definition for "deception" (internal quotation marks and citation omitted)).

268.    Plaintiff and class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

269.    Each defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

270.    The Florida Legislature has provided that a person who has suffered a loss as a result of a violation of FUDTPA may recover actual damages, plus attorneys' fees and court costs, all of which Local 464A seeks in this action. Local 464A is entitled to recover its actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

271.    FUDTPA provides that "[a]nyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."[88] Local 464A seeks an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the FUDTPA.

## COUNT ELEVEN

### VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT GA. CODE ANN. § 10-1-370, *ET SEQ.* (Against Eli Lilly, Novo Nordisk, and Sanofi)

272.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

273.    Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include: "Mak[ing] false or misleading statements of fact

---

[88] Fla. Stat. § 501.211(1).

concerning the reasons for, existence of, or amounts of price reductions" or "Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[89]

274.    The defendants, plaintiff, and class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

275.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes making "false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in . . . conduct which similarly creates a likelihood of confusion or of misunderstanding."[90]

276.    Local 464A seeks an order that enjoin each defendant's unfair, unlawful, and/or deceptive practices, awards attorneys' fees, and awards any other just and proper relief available under Ga. Code Ann. § 10-1-373.

### COUNT TWELVE

### VIOLATION OF THE HAWAII ACT § 480-2(A)
### HAW. REV. STAT. § 480, *ET SEQ.*
### (Against Novo Nordisk and Sanofi)

277.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

278.    Hawaii Rev. Stat. § 480-2(a) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

279.    Each defendant is a "person" under Haw. Rev. Stat. § 480-1.

---

[89] Ga. Code Ann § 10-1-372(a).

[90] *Id.*

280.     Local 464A and class members are "consumer[s]," as defined by Haw. Rev. Stat. § 480-1, who purchased the analog insulins at issue.

281.     As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts under Haw. Rev. Stat. § 480-2.[91]

282.     Pursuant to Haw. Rev. Stat. § 480-13, Local 464A seeks monetary relief against each defendant measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

### COUNT THIRTEEN

### VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### IDAHO CODE § 48-601, *ET SEQ.*
### (Against Novo Nordisk and Sanofi)

283.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

284.     The Idaho Consumer Protection Act (Idaho CPA) prohibits "unfair or deceptive acts or practices, including, but not limited to: "(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer"; or "(18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce."[92]

285.     Each defendant is a "person" under Idaho Code Ann. § 48-602(1).

---

[91] *Id.*

[92] Idaho Code Ann. § 48-603.

286.     The defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

287.     As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts under the Idaho CPA.[93]

288.     Under Idaho Code § 48-608, Local 464A seeks monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff.

289.     Local 464A also seeks an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

290.     Local 464A also seeks punitive damages against defendants because each defendant's conduct evidences an extreme deviation from reasonable standards. The defendants flagrantly, maliciously, and fraudulently misrepresented the actual cost of their analog insulin products and the existence, purpose, and amount of the rebates granted to the PBMs. They concealed facts that only they knew. The defendants' unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

---

[93] *Id.*

## COUNT FOURTEEN

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT 815 ILL. COMP. STAT. § 505/1, *ET SEQ.* (Against Eli Lilly, Novo Nordisk, and Sanofi)

291.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

292.    The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."[94]

293.    That section also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[95]

294.    Each defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

295.    Local 464A and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

296.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the ICFA.

---

[94] 815 Ill. Comp. Stat. § 505/2.

[95] *Id.*

297.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the ICFA.[96]

298.    The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . . ."[97] Pursuant to this provision of the code, Local 464A seeks monetary relief against each defendant in the amount of actual damages, as well as punitive damages because defendants each acted with fraud and/or malice and/or was grossly negligent.

299.    Local 464A also seeks an order enjoining each defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

## COUNT FIFTEEN

**VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
KAN. STAT. § 50-623, *ET SEQ.*
(Against Novo Nordisk)**

300.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

301.    The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."[98] Deceptive acts or practices include, but are not limited to: "the willful use, in any oral or written

---

[96] *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (stating that "[a] plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct" and "may allege that conduct is unfair . . . without alleging that the conduct is deceptive").

[97] 815 Ill. Comp. Stat. § 505/10a.

[98] Kan. Stat. § 50-626(a).

representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; and "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions."[99] These acts constitute deceptive conduct "whether or not any consumer has in fact been misled."[100]

302.    Plaintiff and class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased insulin.

303.    The sale of insulin was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

304.    The defendants' conduct, as described in this complaint, constitutes "deceptive" practices in violation of the Kansas CPA.

305.    Under Kan. Stat. Ann. § 50-634, Local 464A seeks monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

306.    Local 464A also seeks an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

---

[99] *Id.* § 50-626(b).

[100] *Id.*

COUNT SIXTEEN

**VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
LA. REV. STAT. § 51:1401, *ET SEQ.*
(Against Eli Lilly, Novo Nordisk, and Sanofi)**

307.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

308.     The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."[101]

309.     The defendants, plaintiff, and class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).

310.     Local 464A and class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

311.     Each defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

312.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" practices in violation of the Louisiana CPL.

313.     Pursuant to La. Rev. Stat. § 51:1409, plaintiff seeks to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

---

[101] La. Rev. Stat. § 51:1405(A).

## COUNT SEVENTEEN

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### MD. COM. LAW CODE § 13-101, *ET SEQ.*
### (Against Eli Lilly and Novo Nordisk)

314.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

315.    The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice, including: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"; "Failure to state a material fact if the failure deceives or tends to deceive"; "False or misleading representation[s] of fact which concern[] . . . [t]he reason for or the existence or amount of a price reduction"; and "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same."[102] The statute further provides that a person may not engage in such conduct regardless of whether the consumer is actually deceived or damaged.[103]

316.    Defendants, plaintiff, and class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

317.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maryland CPA.

318.    Pursuant to Md. Code, Com. Law § 13-408, plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

---

[102] Md. Code, Com. Law § 13-301.

[103] *Id.* § 13-302.

319.    Local 464A also seeks an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under Md. Code, Com. Law § 13-406.

## COUNT EIGHTEEN

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**MICH. COMP. LAWS § 445.902, *ET SEQ.***
**(Against Eli Lilly, Novo Nordisk, and Sanofi)**

320.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

321.    The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."[104]

322.    Plaintiff and class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

---

[104] Mich. Comp. Laws § 445.903(1).

323.    Each defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

324.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Michigan CPA.

325.    Local 464A seeks: injunctive against the defendants to prevent their continuing unfair and deceptive acts; monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

326.    Local 464A also seeks punitive damages because each defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented the actual price of their analog insulins, inflated their list prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. They manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford a life-saving product. The defendants' conduct constitutes malice, oppression, and fraud, warranting punitive damages.

## COUNT NINETEEN

### VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### MINN. STAT. § 325F.68, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

327.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

328.    The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."[105]

329.    Each purchase of analog insulin constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

330.    The defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota CFA.

331.    Pursuant to Minn. Stat. § 8.31(3a), Local 464A seeks actual damages, attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota CFA.

332.    Local 464A also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT TWENTY

### VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT
### MINN. STAT. §§ 325D.43-48, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

333.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

334.    The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact

---

[105] Minn. Stat. § 325F.69(1).

concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[106]

335.    The defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota DTPA.

336.    Pursuant to Minn. Stat. §§ 325 D.45, F.70, Local 464A seeks actual damages, attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota DTPA.

337.    Local 464A also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT TWENTY-ONE

### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### MO. REV. STAT. § 407.010, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

338.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

339.    The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."[107]

---

[106] Minn. Stat. § 325D.44.

[107] Mo. Rev. Stat. § 407.020.1.

340.     The defendant, plaintiff, and class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

341.     The defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

342.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Missouri MPA.

343.     The defendants are liable to Local 464A for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT TWENTY-TWO

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### NEB. REV. STAT. § 59-1601, *ET SEQ.*
### (Against Novo Nordisk and Sanofi)

344.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

345.     The Nebraska Consumer Protection Act (Nebraska CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[108]

346.     The defendants, plaintiff, and class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

---

[108] Neb. Rev. Stat. § 59-1602.

347.    The defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

348.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Nebraska CPA.

349.    Because the defendants' conduct caused injury to Local 464A's property through violations of the Nebraska CPA, Local 464A seeks recovery of: actual damages, as well as enhanced damages up to $1,000; an order enjoining each defendant's unfair or deceptive acts and practices; costs of Court; reasonable attorneys' fees; and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## COUNT TWENTY-THREE

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### NEV. REV. STAT. § 598.0903, *ET SEQ.*
### (Against Sanofi)

350.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

351.    The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions"[109]; "[k]nowingly makes any other false representation in a transaction"[110]; "[f]ails to disclose a material fact in connection with the sale or lease of goods or

---

[109] Nev. Rev. Stat. § 598.0915.

[110] *Id.*

services"[111]; and/or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion."[112]

352.    The defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Nevada CTPA.

353.    Local 464A seeks its actual damages, punitive damages, an order enjoining the defendants' deceptive acts or practices, costs of court, attorneys' fees, and all other appropriate and available remedies under Nev. Rev. Stat. § 41.600.

### COUNT TWENTY-FOUR

**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT
N.H. REV. STAT. § 358-A:1, *ET SEQ.*
(Against Novo Nordisk and Sanofi)**

354.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

355.    The New Hampshire Consumer Protection Act (New Hampshire CPA) prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, but not limited to: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and/or "[p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition."[113]

---

[111] *Id.* § 598.0923.

[112] *Id.* § 598.0925.

[113] N.H. Rev. Stat. § 358-A:2.

356.     The defendants, plaintiff, and class members are "persons" under N.H. Rev. Stat. § 358-A:1.

357.     The defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

358.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the New Hampshire CPA.

359.     Because the defendants' willful conduct caused injury to Local 464A's property through violations of the New Hampshire CPA, Local 464A seeks recovery of: actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining each defendant's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. Rev. Stat. § 358-A:10.

### COUNT TWENTY-FIVE

#### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
#### N.J. STAT. ANN. § 56:8-1, *ET SEQ.*
#### (Against Eli Lilly, Novo Nordisk, And Sanofi)

360.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

361.     The New Jersey Consumer Fraud Act (NJCFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with

the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."[114]

362.    The defendants, plaintiff, and class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

363.    The defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

364.    As described above, the defendants' conduct, as described in this complaint, constitutes "deceptive," "unfair," and "unconscionable" acts or practices in violation of the NJCFA.

365.    This wrongful conduct by the defendants, coupled with the damage class members incurred, entitles members of the class to relief under the NJCFA. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[115] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[116]

---

[114] N.J. Stat. Ann. § 56:8-2.

[115] N.J. Stat. Ann. § 56:8-19.

[116] *Id.*

366.    Therefore, Local 464A is entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT TWENTY-SIX

### VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### N.M. STAT. § 57-12-1, *ET SEQ.*
### (Against Novo Nordisk and Sanofi)

367.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

368.    The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to: "making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction"; "making false or misleading statements of fact for the purpose of obtaining appointments for the demonstration, exhibition or other sales presentation of goods or services"; and/or "failing to state a material fact if doing so deceives or tends to deceive."[117]

369.    The New Mexico UTPA further makes unlawful "unconscionable trade practice[s]," meaning "an act or practice in connection with the sale . . . or in connection with the offering for sale . . . of any goods or services, . . . that to a person's detriment: (1) takes advantage of the lack of

---

[117] N.M. Stat. Ann. § 57-12-2(D).

knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."[118]

370.   The defendants, plaintiff, and class members are "person[s]" under N.M. Stat. § 57-12-2.

371.   The defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. § 57-12-2.

372.   The defendants' conduct, as described in this complaint, constitutes a pattern of "false or misleading oral or written statement[s]" in violation of N.M. Stat. Ann. § 57-12-2(D).

373.   The defendants' conduct, as described in this complaint, also constitutes a pattern of "unconscionable trade practice[s]" in violation of N.M. Stat. Ann. § 57-12-2(E).

374.   Because the defendants' false, unconscionable, and willful conduct caused actual harm to Local 464A, Local 464A seeks recovery of: actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; reasonable attorneys' fees and costs; injunctive relief, and all other proper and just relief available under N.M. Stat. § 57-12-10.

## COUNT TWENTY-SEVEN

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### N.Y. GEN. BUS. LAW §§ 349-350
### (Against Eli Lilly, Novo Nordisk, And Sanofi)

375.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

---

[118] *Id.* § 57-12-2(E).

376.    The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."[119]

377.    Local 464A and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

378.    Each defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

379.    The defendants' conduct, as described in this complaint, constitutes deceptive acts in violation of the New York GBL.

380.    The defendants' deceptive acts and practices, which were intended to mislead health plans who cover analog insulin purchases for their members, constitutes conduct directed at consumers.

381.    Because the defendants' willful and knowing conduct caused injury to Local 464A, Local 464A seeks recovery of: actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining defendants' unlawful conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

---

[119] N.Y. Gen. Bus. Law § 349.

## COUNT TWENTY-EIGHT

## VIOLATION OF THE NORTH CAROLINA UNFAIR
## AND DECEPTIVE TRADE PRACTICES ACT
## N.C. GEN. STAT. § 75-1.1, *ET SEQ.*
### (Against Novo Nordisk and Sanofi)

382.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

383.    North Carolina's Unfair and Deceptive Acts and Practices Act (NCUDTPA) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."[120]

384.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the NCUDTPA.

385.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the NCUDTPA.[121]

386.    Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

387.    Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages: "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done,

---

[120] N.C. Gen. Stat. § 75-1.1(a).

[121] *Melton v. Family First Mortg. Corp.*, 576 S.E.2d 365, 368 (2003) ("A practice is unfair [under the NCUDTPA] when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" and offering a separate definition for "deceptive" practices (internal quotation marks and citations omitted)).

and if damages are assessed in such case judgment shall be rendered in favor of Local 464A and against the defendant for treble the amount fixed by the verdict."[122]

388.    Local 464A seeks an order trebling their actual damages, an order enjoining defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## COUNT TWENTY-NINE

### VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### N.D. CENT. CODE § 51-15-02
### (Against Eli Lilly)

389.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

390.    The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice."[123] The statute further provides that the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice."[124]

---

[122] N.C. Gen. Stat. § 75-16.
[123] N.D. Cent. Code § 51-15-02.
[124] *Id.*

391.    The defendants, plaintiff, and class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

392.    The defendants engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

393.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the North Dakota CFA.

394.    In addition, the defendants' conduct, as described in this complaint, constitutes "unconscionable conduct" acts in violation of the North Dakota CFA.

395.    The defendants knowingly committed the conduct described above. As a result, under N.D. Cent. Code § 51-15-09, the defendants are liable to Local 464A for treble damages in amounts to be proven at trial, attorneys' fees, costs, and disbursements. Local 464A further seeks an order enjoining each defendant's unfair and/or deceptive acts or practices as well as other just and proper available relief under the North Dakota CFA.

## COUNT THIRTY

### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

396.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

397.    The Ohio Consumer Sales Practices Act (Ohio CSPA) broadly prohibits "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."[125] Specifically, and

---

[125] Ohio Rev. Code Ann. § 1345.02.

without limitation on the broad prohibition, the Ohio CSPA prohibits suppliers from representing that "a specific price advantage exists, if it does not."[126]

398.    Each defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

399.    Local 464A and class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D).

400.    The relevant health plan payments for analog insulins are "consumer transaction[s]" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

401.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Ohio CSPA.

402.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the Ohio CSPA.

403.    As a result of the defendants' wrongful conduct, Local 464A has been damaged in an amount to be proven at trial. It will seek all just and proper remedies, including, but not limited to: actual and statutory damages, an order enjoining defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.*

---

[126] *Id.*

## COUNT THIRTY-ONE

### VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### OKLA. STAT. TIT. 15, § 751, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

404.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

405.    The Oklahoma Consumer Protection Act (Oklahoma CPA) declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction"[127] and/or "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[128]

406.    The Oklahoma CPA further provides that if "[t]he commission of any act or practice declared to be a violation of the Consumer Protection Act" "is also found to be unconscionable," the violator is liable to the aggrieved customer for the payment of a civil penalty, recoverable in an individual action only, in a sum set by the court of not more than Two Thousand Dollars ($2,000.00) for each violation."[129] "In determining whether an act or practice is unconscionable the following circumstances shall be taken into consideration by the court: (1) whether the violator knowingly or with reason to know, took advantage of a consumer reasonably unable to protect his or her interests because of his or her age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

---

[127] Okla. Stat. tit. 15, § 753.

[128] *Id.* § 752.

[129] *Id.* § 761.1.

(2) whether, at the time the consumer transaction was entered into, the violator knew or had reason to know that price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers; . . . [and] (4) whether the violator knew or had reason to know that the transaction he or she induced the consumer to enter into was excessively one-sided in favor of the violator."[130]

407.    Local 464A and class members are "persons" under Okla. Stat. tit. 15, § 752.

408.    Each defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

409.    The sale of insulin was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and each defendant's actions as set forth herein occurred in the conduct of trade or commerce.

410.    The defendants' conduct, as described in this complaint, constitutes "false or misleading statements" in violation of the Oklahoma CPA. The defendants' conduct, as described in this complaint, further constitutes practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to health plans in violation of the Oklahoma CPA.

411.    The defendants' conduct as alleged herein was also unconscionable because (1) the defendants, knowingly or with reason to know, took advantage of health plans reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) the defendants knew or had reason to know that their list prices grossly exceeded the prices at which similar property or services were readily obtainable in similar transactions by like consumers; and (3) the defendants knew or had

---

[130] *Id.*

reason to know that the transactions they induced the health plans to enter were excessively one-sided in favor of each defendant.

412.    Local 464A seeks punitive damages because the defendants' conduct was egregious. The defendants misrepresented the actual prices of their analog insulins, inflated their list prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of health plans. They manipulated the prices of their life-saving analog insulins without regard to the impact of their scheme on health plans and their ability to provide healthcare to theirparticipants. The defendants' egregious conduct warrants punitive damages.

413.    Furthermore, because the defendants' unconscionable conduct caused injury to plaintiff, plaintiff seeks recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees under Okla. Stat. tit. 15, § 761.1. Local 464A further seek an order enjoining each defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under the Oklahoma CPA.

## COUNT THIRTY-TWO

### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### OR. REV. STAT. § 646.605, *ET SEQ.*
### (Against Novo Nordisk and Sanofi)

414.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

415.    The Oregon Unfair Trade Practices Act (Oregon UTPA) prohibits a person from, in the course of the person's business: making "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions"; making "false or

misleading representations of fact concerning the offering price of, or the person's cost for . . . goods"; or engaging "in any other unfair or deceptive conduct in trade or commerce."[131]

416.    Each defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

417.    Each analog insulin at issue is a "good" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

418.    The defendants' conduct, as described in this complaint, constitutes "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions" on the analog insulins; "false or misleading representations of fact concerning the offering price of, or the person's cost for" the analog insulins; and "unfair or deceptive conduct."[132]

419.    Local 464A is entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Local 464A is also entitled to punitive damages because defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others. Local 464A further seeks an order enjoining each defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under Or. Rev. Stat. §§ 646.632, 636.

**COUNT THIRTY-THREE**

**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
S.C. CODE ANN. § 39-5-10, *ET SEQ.*
(Against Novo Nordisk and Sanofi)**

420.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

---

[131] Or. Rev. Stat. § 646.608(1).

[132] *Id.*

421.    The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[133]

422.    Each defendant is a "person" under S.C. Code Ann. § 39-5-10.

423.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the South Carolina UTPA.

424.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the South Carolina UTPA.

425.    Pursuant to S.C. Code Ann. § 39-5-140(a), Local 464A seeks monetary relief to recover their economic losses. Because the defendants' actions were willful and knowing, Local 464A's damages should be trebled.

426.    Local 464A further alleges that the defendants' malicious and deliberate conduct warrants an assessment of punitive damages because the defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others. The defendants misrepresented the actual prices of the analog insulins, inflated their benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of health plans and consumers. They manipulated the prices of their life-saving products without regard to the impact of their scheme on health plans and their ability to provide benefits to their participants. The defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

---

[133] S.C. Code Ann. § 39-5-20(a).

427.    Local 464A further seeks an order enjoining each defendant's unfair or deceptive acts or practices.

## COUNT THIRTY-FOUR

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### TENN. CODE ANN. § 47-18-101, *ET SEQ.*
### (Against Eli Lilly and Novo Nordisk)

428.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

429.    Tennessee Consumer Protection Act (Tennessee CPA) prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."[134]

430.    Local 464A and class members are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2).

431.    Each defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

432.    Each defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

433.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Tennessee CPA.

434.    Pursuant to Tenn. Code Ann. § 47-18-109(a), Local 464A seeks monetary relief against each defendant measured as actual damages in an amount to be determined at trial, treble

---

[134] Tenn. Code Ann. § 47-18-104.

damages as a result of defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

COUNT THIRTY-FIVE

**VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT**
**UTAH CODE § 13-11-1, *ET SEQ.***
**(Against Eli Lilly, Novo Nordisk, and Sanofi)**

435.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

436.    The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."[135]

437.    "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.[136]

438.    As alleged in this complaint, the defendants have engaged in deceptive acts in violation of the Utah CSPA.

439.    They have also engaged in unconscionable actions in violation of the Utah CSPA. The defendants knew, or had reason to know, that health plans would rely on their reported list price as the prices of their analog insulin. And they knew that these list prices were not fair or reasonable approximations of the actual cost of those analog insulins.

440.    Pursuant to Utah Code Ann. § 13-11-4, Local 464A seeks: monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b)

---

[135] Utah Code § 13-11-4.

[136] *Id.* § 13-11-5.

statutory damages in the amount of $2,000 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

**COUNT THIRTY-SIX**

**VIOLATION OF THE VERMONT CONSUMER FRAUD ACT**
**VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.***
**(Against Novo Nordisk and Sanofi)**

441.    Local 464A incorporates by reference the allegations contained in the preceding paragraphs.

442.    The Vermont Consumer Fraud Act (Vermont CFA) makes unlawful "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."[137]

443.    The defendants were sellers within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

444.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Vermont CFA.

445.    The defendants' conduct, as described in this complaint, constitutes "unfair acts" in violation of the Vermont CFA.

446.    Local 464A is entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

---

[137] Vt. Stat. Ann. tit. 9, § 2453(a).

## COUNT THIRTY-SEVEN

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### VA. CODE ANN. § 59.1-196, *ET SEQ.*
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

447.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

448.    The Virginia Consumer Protection Act (Virginia CPA) lists prohibited "fraudulent acts or practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."[138]

449.    Each defendant is a "supplier" under Va. Code Ann. § 59.1-198.

450.    The defendants' advertisements of the analog insulins' list prices were "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

451.    The defendants' conduct, as described in this complaint, constitutes "fraudulent acts" in violation of the Virginia CPA.

452.    Pursuant to Va. Code Ann. § 59.1-204, Local 464A seeks monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each class member. Because the defendants' conduct was committed willfully and knowingly, Local 464A is entitled to recover, for each class member, the greater of (a) three times actual damages or (b) $1,000.

---

[138] Va. Code Ann. § 59.1-200.

453.    Local 464A also seeks an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq.*

## COUNT THIRTY-EIGHT

### VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### WIS. STAT. § 100.18
### (Against Eli Lilly, Novo Nordisk, and Sanofi)

454.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

455.    The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading."[139]

456.    Each defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

457.    Local 464A and class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

458.    The defendants' conduct, as described in this complaint, constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

459.    Local 464A is entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because the defendants' conduct was committed knowingly and/or intentionally, Local 464A is entitled to treble damages.

---

[139] Wis. Stat. § 100.18(1).

460.    Local 464A also seeks court costs and attorneys' fees under Wis. Stat.

§ 110.18(11)(b)(2).

## DEMAND FOR JUDGMENT

WHEREFORE, Local 464A, on behalf of itself and the proposed class, respectfully

demand that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal

Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as

provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare Local 464A

as the representative of the class;

B.    Enter judgments against the defendants and in favor of Local 464A and the class;

C.    Award the class damages (i.e., three times overcharges) in an amount to be

determined at trial;

D.    Award Local 464A and the class their costs of suit, including reasonable attorneys'

fees as provided by law; and

E.    Enjoin the defendants from continuing to report artificially inflated list prices that

do not approximate their true net prices to CVS, Express Scripts, and OptumRx.

F.    Award such further and additional relief as the case may require and the Court may

deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Local 464A, on behalf of itself and the

proposed class, demand a trial by jury on all issues so triable.

Dated: October 2, 2023                 Respectfully submitted,

                                       By _____/s/ James E. Cecchi_____
                                       James E. Cecchi
                                       John M. Agnello
                                       Donald A. Ecklund
                                       Kevin G. Cooper
                                       CARELLA, BYRNE, CECCHI,
                                       OLSTEIN, BRODY & AGNELLO, P.C.
                                       5 Becker Farm Road
                                       Roseland, NJ 07068
                                       Telephone: (973) 994-1700
                                       Facsimile: (973) 994-1744
                                       jcecchi@carellabyrne.com
                                       jagnello@carellabyrne.com
                                       decklund@carellabyrne.com
                                       kcooper@carellabyrne.com

                                       Steve W. Berman
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       1301 Second Ave., Suite 2000
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile:  (206) 623-0594
                                       steve@hbsslaw.com

                                       Thomas M. Sobol
                                       Hannah W. Brennan
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       55 Cambridge Parkway, Suite 301
                                       Cambridge, MA 02142
                                       Telephone: (617) 482-3700
                                       Facsimile:  (617) 482-3003
                                       tom@hbsslaw.com
                                       hannahb@hbsslaw.com

                                       Mark T. Vazquez
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       455 N. CityFront Plaza Dr., Suite 2410
                                       Chicago, IL 60611
                                       Telephone: (708) 628-4962
                                       Facsimile:  (708) 628-4950
                                       markv@hbsslaw.com

James R. Dugan, II
David S. Scalia
TerriAnne Benedetto
Glenn E. Mintzer
THE DUGAN LAW FIRM
365 Canal Street
One Canal Place, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
tbenedetto@dugan-lawfirm.com
jdugan@dugan-l awfirm.com
dscalia@dugan-lawfirm.com
gmintzer@dugan-lawfirm.com

Eric L. Young, Esq
YOUNG LAW GROUP
3031C Walton Road, Suite 301
Plymouth Meeting, Pa 19462
Phone: (215) 367-5151
Fax: (215) 367-5143
eyoung@young-lawgroup.com

*Attorneys for Plaintiff*